RENAISSANCE LEASING, LLC,
et al., Appellants,

v.

VERMEER MANUFACTURING
COMPANY, Vermeer Great
Plains, Inc., Respondents.

No. SC 90258.

Supreme Court of Missouri,
En Banc.

Aug. 31, 2010.

Rehearing Denied Oct. 26, 2010.

Kirk T. May, William D. Beil, Rouse Hendricks German May PC, Kansas City, for Renaissance Leasing and the other plaintiffs/appellants.

W. Perry Brandt, Fred L. Sgroi, Bryan Cave LLP, Gary J. Willnauer, Ryan R. Cox, Morrow, Willnauer & Klosterman LLC, Kansas City, for Respondents.

WILLIAM RAY PRICE, JR., Chief Justice.

## I. Introduction

Renaissance Leasing LLC, TEAM Excavating LLC, and John Uhlmann appeal the grant of summary judgment in favor of Vermeer Manufacturing Company and Vermeer Great Plains, Inc., on claims for fraud, negligent misrepresentation, breach of express and implied warranty, and breach of contract. All of the claims arise from the sale of a piece of heavy mining equipment—a T1055 terrain leveler—to a non-party, Crush Technology LLC. Crush purportedly transferred ownership of the T1055 to Renaissance and then later distributed its liquidation assets to Uhlmann, who assigned any rights of action to TEAM. Uhlmann owns both Renaissance and TEAM.

Evidence in the record is sufficient to demonstrate a genuine issue of material fact about transfer of the T1055 and assignment of the warranty rights. The grant of summary judgment in favor of Vermeer on Renaissance's breach of express warranty claim is reversed, as is the grant of summary judgment in favor of Vermeer on Uhlmann's negligent misrepresentation claim. The grant of summary judgment for all other claims and parties is affirmed.

Affirmed in part, reversed in part, vacated in part, and remanded.

## II. Facts and Procedural History

The facts underlying this multi-party lawsuit are complicated due to the financing relationships among the various business entities associated with Uhlmann, which were formed to hold, lease, or operate the terrain leveler at issue. In addition, the original purchaser of the terrain leveler and holder of the warranty rights is not a party to the litigation. Crush Technology LLC ("Crush") was formed by Jeff Hall and several others to quarry limestone from the Phenix Quarry near Springfield. To that end, they acquired a Vermeer T1055 terrain leveler from Vermeer Great Plains ("Great Plains"), an independent dealer and regional distributor for Vermeer Manufacturing Company ("Vermeer"). The T1055 was designed and marketed for surface mining, overburden removal, road construction, and soil remediation. Before any payment or sales contract was made, the terrain leveler was transported to the quarry for a two-month demonstration period, during which Crush tested it under various conditions to see how well it would perform overburden crushing and rock excavation. The T1055 performed well on the overburden or scrap rock but experienced problems when used to excavate hard limestone on the quarry floor. Crush chose to purchase the machine after the demonstration period but notified Great Plains and Vermeer about its concerns.

Soon after formation, Crush sought investment or financing for its business from

John Uhlmann ("Uhlmann")[1] and the Uhlmann Company, a Kansas City firm consisting of members of the Uhlmann family. The Uhlmann Company declined investment in the business but agreed to make loans to Crush on the condition that Uhlmann personally guarantee the loans. Uhlmann, who was impressed by Crush's business plan and by the performance of the T1055, made additional loans to Crush on his own behalf. Crush executed a sales contract with Great Plains for purchase of the T1055 for $670,000 on September 30, 2002. The T1055 was warranted against defects by the manufacturer for a period of one year or 1,000 operating hours. Even though Uhlmann was not a member of Crush, he participated in the decision to purchase the terrain leveler. Using the money loaned by the Uhlmann Company, Crush paid $600,000 to Great Plains on October 8. Prior to paying the remaining $70,000 on October 25, Crush members[2] and Uhlmann met with Vermeer representatives at Vermeer's headquarters, where they sought and received assurance that the T1055 would be repaired or redesigned to function as represented.

In December 2002, Uhlmann took a 92.5 percent membership interest in Crush after the members of Crush executed an amended operating agreement, purportedly in consideration for the money Uhlmann personally had loaned to the company. At the same time, Uhlmann formed Renaissance Leasing Company LLC ("Renaissance"), with himself as sole member, for the purpose of owning and leasing Crush's mining equipment. Soon afterward, the terrain leveler allegedly was transferred to Renaissance—as security for Uhlmann's "investment"—and then leased back to Crush. No records document the transfer. The record on appeal is silent as to whether the written limited warranty also was transferred to Uhlmann. Beginning in October 2002, Great Plains and Vermeer performed warranty repairs on the terrain leveler. In January 2003, the machine was moved from the Phenix Quarry to a highway location, where it continued to be operated.

By April 2003, Uhlmann had fired Jeff Hall, Gary Watts, and Terry Watts, three of the founding members of Crush. He renamed the company Mo–Kan Rock & Gravel Company LLC ("Mo–Kan"). Renaissance notified Mo–Kan in August 2003 that Mo–Kan had defaulted on its rental payments. At the same time, Uhlmann formed TEAM Excavating LLC ("TEAM") with himself as sole member. In September 2003, he dissolved Mo–Kan and, as the only remaining member with a positive capital account balance, received distribution of the liquidation proceeds. In June 2004—nearly a year later—Uhlmann assigned Mo–Kan's liquidation proceeds to TEAM by written agreement. Also in June, TEAM executed a lease agreement with Renaissance for the same equipment that previously had been leased back to Crush/Mo–Kan. Between September 2003 and June 2004, TEAM used the T1055 and other Renaissance-owned equipment without any kind of lease agreement in place. At no time during this series of transfers and leases did any of the equipment physically change hands.

A diagram summarizing the various business entities and transactions involved in the underlying lawsuit is included below:

---

1. Uhlmann died August 21, 2009. Patricia Werthan Uhlmann, executrix of Uhlmann's will, was substituted as a party in this action November 17, 2009.

2. A "member" is the holder of an ownership interest in a limited liability company.

In May 2005, Uhlmann, Renaissance, and TEAM filed suit against Vermeer and Great Plains in United States district court for damages associated with the purchase of the T1055. They claimed that the defendants had engaged in misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1125, as well as fraud, negligent misrepresentation, and breach of warranty in violation of state law. The federal court dismissed the Lanham Act claim on the merits and the state claims for lack of subject matter jurisdiction.

In August 2006, the plaintiffs filed the underlying action in Jackson County circuit court, asserting claims of fraud, negligent misrepresentation, breach of express and implied warranty, and breach of contract. Vermeer and Great Plains moved separately for summary judgment on several grounds, including plaintiffs' lack of standing. The trial court granted summary judgment in favor of Vermeer in June 2007 and in favor of Great Plains in September 2007. This appeal followed.

## III. Standard of Review

 The standard of review when considering an appeal from summary judgment is essentially *de novo*. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper when there is no genuine issue as to any material fact and the moving party

is entitled to judgment as a matter of law. *Larabee v. Eichler*, 271 S.W.3d 542, 545 (Mo. banc 2008); Rule 74.04(c)(6). A defending party moving for summary judgment may establish a right to judgment by showing facts that negate any one of the claimant's elements. *Fetick v. American Cyanamid Co.*, 38 S.W.3d 415, 418 (Mo. banc 2001). If the moving party makes a prima facie showing that it is entitled to judgment as a matter of law, the non-moving party then has a specific burden: "A denial may not rest upon the mere allegations or denials of the party's pleading. Rather, the response shall support each denial with specific references to the discovery, exhibits or affidavits that demonstrate specific facts showing that there is a genuine issue for trial." Rule 74.04(c)(2). The court accords the non-moving party the benefit of all reasonable inferences in the record. *ITT*, 854 S.W.2d at 376. An order of summary judgment may be affirmed under any theory that is supported by the record. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010).

## IV. Analysis

As a preliminary matter, the plaintiffs' petition attempts to establish a collective identity for the separate business entities and individuals involved. In an apparent effort to simplify the pleadings, the petition states that the term "TEAM" when used alone refers to Crush, Renaissance, and TEAM collectively. By pleading this way, the plaintiffs conflate the interests of a non-party—Crush—with the separate interests of Renaissance and TEAM. They create confusion about which party is alleging harm for each count and which party is entitled to relief on a particular theory.

■ Separate entities rise and fall on their own claims. Missouri law does not recognize a "collective" corporate identity, so each entity must plead and prove its claims individually to be entitled to relief. Uhlmann's position as sole or majority member of various companies does not equate to an identity of interests between them. Each company is a distinct legal entity with the right to own property, sue and be sued, contract, and acquire and transfer property. *See* §§ 347.061, 347.063, and 347.069, RSMo 2000.[3] The mere identity of members or officers of two companies does not result in an identity of interests between the two companies. *See Blackwell Printing Co. v. Blackwell–Wielandy Co.*, 440 S.W.2d 433, 437 (Mo. 1969). This Court will interpret strictly the allegations and interests of each individual entity without deference to claims of collective identity.

The plaintiffs raise two substantive points on appeal.[4] First, they argue that summary judgment for Vermeer and Great Plains on the warranty and contract claims was improper because (a) any warranty and contract claims belonging to the original purchaser of the T1055 were either transferred or assigned to Renaissance and TEAM and (b) disputed material facts show that Vermeer breached its express written warranty and Great Plains breached implied warranties of merchantability and fitness. Second, they argue that summary judgment for Vermeer on the misrepresentation claims was improper because (a) Uhlmann was harmed directly by Vermeer's misrepresentations to him as an individual, (b) TEAM was assigned any

---

3. All statutory references are to RSMo 2000, unless otherwise noted.

4. Plaintiffs also raise a third point, which is rendered moot by disposition of the first two points but will be addressed at the end of the opinion.

misrepresentation claims belonging to the original purchaser, and (c) material facts exist showing that Uhlmann and TEAM can establish each element of their fraud and negligent misrepresentation claims.

## A. BREACH OF WARRANTY AND CONTRACT CLAIMS

### 1. *Breach of Express Warranty*

After a two-month examination period at the Phenix Quarry, Crush purchased the T1055 from Vermeer's dealer, Great Plains, in October 2002. Vermeer issued a written limited warranty to the owner against defects in material and workmanship for one year or 1,000 operating hours.[5] The warranty contained numerous terms, exclusions, and limitations. It provided that, during the warranty period, Vermeer was obligated to repair or replace (at its option) any defect in material or workmanship.[6] The warranty did not obligate Vermeer to repair or replace any defect if the defect was caused by "other than normal use." It disclaimed all implied warranties of merchantability and fitness for a particular purpose.[7] The warranty also purported to limit Vermeer's liability to the purchase price of the T1055[8] and to exclude liability for any incidental or consequential damages, including loss of profits and out-of-service time.[9] The warranty did not specifically identify the warrantee, although Crush was specified as the "owner." While it imposed responsibility for proper maintenance and periodic inspections on the "retail purchaser," the warranty did not state either that it extended to subsequent purchasers or that it was limited to the original retail purchaser. Moreover, no term in the warranty forbade the assignment of rights or obligations by any party.

The plaintiffs claim relief for breach of express warranty on two theories. Renaissance argues that it holds rights under the written warranty because Crush transferred the T1055 and assigned its warranty to Renaissance in December 2002. TEAM argues that it holds Crush's claim for breach of express warranty because all of Crush's assets, including any breach of warranty claims, were assigned to TEAM by Uhlmann upon the dissolution of Crush/Mo–Kan in June 2004.[10] Neither of the

---

5. "Vermeer Mfg. Company (hereinafter 'Vermeer') warrants each new Industrial product of Vermeer's manufacture to be free from defect in material and workmanship, under normal use and service for one (1) full year after initial purchase/retail sale or 1000 operating hours, whichever occurs first."

6. "During the Limited Warranty period specified above, any defect in material or workmanship in any warranted item of Vermeer Industrial Equipment not excluded below shall be repaired or replaced at Vermeer's option without charge by any authorized independent Vermeer dealer."

7. "*EXCLUSIONS OF WARRANTIES:* EXCEPT FOR THE WARRANTIES EXPRESSLY AND SPECIFICALLY MADE HEREIN, VERMEER MAKES NO OTHER WARRANTIES, AND ANY POSSIBLE LIABILITY OF VERMEER HEREUNDER IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."

8. "In no event shall Vermeer's liability exceed the purchase price of the product."

9. "Vermeer shall not be liable to any person under any circumstances for any incidental or consequential damages (including but not limited to, loss of profits, out of service time) occurring for any reason at any time."

10. In their petition, the plaintiffs bring a breach of express warranty claim against Great Plains as well as Vermeer. In their briefs, they concede that the written warranty is only between Crush and Vermeer—that is, between purchaser and manufacturer, not purchaser and dealer—and argue the express warranty claim only against manufacturer Vermeer.

plaintiffs' theories fits within the typical "remote purchaser" breach-of-warranty scenario, in which an original purchaser attempts to sue the manufacturer of a good rather than the dealer who sold the good. Instead, in this case, Renaissance is in the position of a subsequent or "second-hand" buyer from the original purchaser, while TEAM is simply the assignee of a contract right.

### (A) Renaissance's Claim for Breach of Express Warranty

Renaissance argues that it is entitled to relief for breach of an express warranty that the T1055 would be free from defects in material and workmanship under normal use for one year or 1,000 hours after purchase. An express warranty is created by any "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain ... that the goods shall conform to the affirmation or promise." § 400.2–313.1(a). Here, the affirmation of fact that created the express warranty was included in the written limited warranty given by Vermeer to Crush, the original purchaser. To bring a breach of warranty claim, therefore, Renaissance must show that Vermeer's limited warranty extended to a subsequent purchaser or transferee of the T1055, one who was neither a party to the original sales contract nor a signatory of the written warranty.

■ The elements for a breach of express warranty claim are: (1) the defendant sold goods to the plaintiff; (2) the seller made a statement of fact about the kind or quality of those goods; (3) the statement of fact was a material factor inducing the buyer to purchase the goods; (4) the goods did not conform to that state-ment of fact; (5) the nonconformity injured the buyer; and (6) the buyer notified the seller of the nonconformity in a timely fashion. *Stefl v. Medtronic, Inc.*, 916 S.W.2d 879, 882–83 (Mo.App.1996); §§ 400.2–313.1(a) and 400.313.2. In Vermeer's motion for summary judgment, the company attempted to establish a right to judgment as a matter of law by showing that Renaissance could not produce enough evidence for the jury to find it suffered a cognizable injury—by showing, specifically, that Renaissance was not injured because there was no evidence it ever owned the T1055 and its warranty.[11] To defeat summary judgment in favor of Vermeer, therefore, Renaissance must provide sufficient evidence for a jury to find the existence of Renaissance's injury. To prove injury for this claim, Renaissance must show that (1) Crush—the original purchaser of the T1055—transferred the machine to Renaissance, (2) Crush assigned the written limited warranty to Renaissance, and (3) Renaissance suffered harm through Vermeer's alleged breach.

### (1) Transfer of the T1055 to Renaissance

■ The first issue is whether the evidence supports Crush's transfer of the terrain leveler to Renaissance. Missouri law requires minimal evidence to establish ownership, with the exception of certificate-of-title property and real property. *Hallmark v. Stillings*, 648 S.W.2d 230, 234 (Mo.App.1983). Written documentation is not required for an LLC transfer of non-titled property. *See id.* In fact, any competent evidence may be introduced to establish the fact of ownership of personal property. *State v. Curry*, 473 S.W.2d 747,

---

11. Although the defendants address ownership of the terrain leveler to challenge the plaintiffs' standing, the real issue underlying standing is whether the party bringing the case is able to prove that it is harmed. If not, then it cannot prove the affirmative element of injury. The analysis can be stated either way.

749 (Mo.1971). Here, there is no dispute that the T1055 is not certificate-of-title property. When determining ownership for personal property with no formal title, "oral evidence from a witness with knowledge concerning ownership of such chattels is competent ... evidence of the fact of ownership." *Hallmark*, 648 S.W.2d at 234. Whether the disputed personal property is a piece of heavy mining equipment or a cow is immaterial, so long as it is non-titled personalty.

Several pieces of evidence support ownership of the T1055 by Renaissance. First, Uhlmann testified that the T1055 was transferred from Crush to Renaissance in December 2002 and that Renaissance owned the machine following that transfer. Because evidence shows that Uhlmann obtained a super-majority interest [12] in Crush prior to the transfer and was sole member of Renaissance, his testimony constitutes competent evidence of the fact of ownership. Second, William Venable, former vice president and chief financial officer of Crush, testified that although he could not recall a specific document transferring the equipment to Renaissance, "there's a list—an inventory list of every asset that we could find that was purchased ... at an auction or outright by the company [Crush] that was conveyed into Renaissance Leasing," including the T1055. Venable also testified that Crush "put the—aggregated the assets that were—what I thought were secured by promissory notes to the company, and the title was conveyed to Renaissance Leasing as another arm to aggregate all the assets." Third, the master lease agreement between Renaissance and Crush supports Renaissance's ownership of the T1055—

and Crush's lack of ownership—following the transfer to Renaissance. The lease, signed by Venable, lists the Vermeer machine in the schedule of equipment owned by Renaissance and leased to Crush. Uhlmann testified that the purpose of the lease was to protect the T1055 from creditors and to capitalize the loan made to Crush. Uhlmann, as a majority member of Crush and sole member of Renaissance, and Venable, as vice president and CFO of Crush, are each "a witness with knowledge concerning ownership of such chattels." *See Hallmark*, 648 S.W.2d at 234. This testimony constitutes competent evidence of the fact of ownership. It is sufficient evidence to allow a jury to find that the terrain leveler was transferred to Renaissance.

**(2)** *Assignment of the Limited Warranty to Renaissance*

■ If evidence supports Crush's transfer of the T1055 to Renaissance, the second issue is whether Crush assigned the manufacturer's limited warranty on the T1055 to Renaissance at the time of transfer. Although Missouri case law has not specifically addressed the assignment of express warranties under these circumstances, the majority view is that an express warranty of fixed duration in a sale of personal property runs with the property on re-sale unless the warranty clearly limits coverage to the first purchaser. *See, e.g., Dravo Equipment Co. v. German*, 73 Or.App. 165, 698 P.2d 63 (1985) (holding that ultimate buyers of a tractor could enforce an express warranty guaranteeing the tractor engine for 1,500 hours even though they were not in privity with original seller and the agreement was silent as to transferability of the warranty); *Lidst-*

---

**12.** According to Crush's operating agreement, a super-majority interest is attained when a member holds more than 66 2/3 percent of the interests held by all members. Uhlmann allegedly was granted a 92.5 percent membership interest, which gave him a super-majority interest in the company.

*rand v. Silvercrest Industries,* 28 Wash. App. 359, 623 P.2d 710 (1981) (holding that, where a mobile home's one-year express warranty did not state it was limited to the original owner, the person who bought the defective mobile home from the original owner was not barred by privity from suing the remote manufacturer for breach of express warranty); *see also* 1 B. Clark & C. Smith, *The Law of Product Warranties* § 10:12 (2d ed., 2002) ("If a seller of goods wants to limit the express warranty to the first purchaser as a matter of contract, so be it. By contrast, if the warranty does not contain such a limit, it should be enforced in favor of a second buyer who takes within the time period stated therein.").[13]

In this case, Vermeer's written warranty states that the warranty period is for one full year or 1,000 operating hours, whichever occurs first. It is undisputed that the warranty would have been in effect at the time it purportedly was transferred to Renaissance in December 2002, three months after the purchase. Moreover, no express terms in the written warranty either restrict its coverage to the original retail purchaser or prohibit its assignment to a subsequent purchaser. In a sale of goods under the UCC, all of the buyer's rights are assignable:

> Unless otherwise agreed all rights of either buyer or seller can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance.

§ 400.2–210.2. Assuming that Vermeer's duty and burden within that time period— to repair or replace the T1055 in case of a defect in material or workmanship—would not be materially changed or increased by assignment of the limited warranty to a new party using the machine for the same purpose, such an assignment is permissible.[14]

While no document in the record clearly purports to assign the limited warranty on the T1055 from Crush to Renaissance, the lack of a formal assignment is not an absolute bar. An express warranty that is not limited to the first purchaser may extend to later purchasers even in the absence of a formal assignment. *Collins Co., Ltd. v.*

---

**13.** The Magnuson–Moss Warranty Act, although it covers only consumer goods (tangible personal property normally used for personal, family, or household purposes), is also instructive. It defines a "consumer"—the person who can bring suit against the manufacturer for violation of the warranty—to include not only the original retail buyer but also "any person to whom such product is transferred *during the duration of an implied or written warranty* . . . applicable to the product." 15 U.S.C. § 2301(3) (1976) (emphasis added). The act's provision about consumer products sold under written warranty is in agreement with majority state law about the assignment of express warranties of fixed duration for non-titled personal property.

**14.** "Section 2–210 favors free assignability of rights and delegation of duties except where the rights and duties of the contracting parties are significantly altered." 1 J. White and R. Summers, *Uniform Commercial Code* 278 (5th ed.2002). Of the states that have adopted this version of section 2–210, only Georgia and Alabama hold that an express warranty may not be assigned because it significantly alters the rights and duties of the contracting parties. *Kaiser Aluminum & Chemical Corp. v. Ingersoll–Rand Co.,* 519 F.Supp. 60, 73–74 (S.D.Ga.1981) (interpreting Georgia law holding that "any assignment of warranties materially changes the risks and burdens of the original seller under the terms of [§ 2–210]."); *Barre v. Gulf Shores Turf Supply, Inc.,* 547 So.2d 503 (Ala.1989) (holding that a resale buyer of equipment lacks privity to support an express warranty claim for economic loss in the absence of evidence that the dealer intended to extend the warranty to a resale purchaser).

*Carboline Co.,* 864 F.2d 560 (7th Cir. [Ill.] 1989) (holding, in response to the Illinois Supreme Court decision in *Collins Co., Ltd. v. Carboline Co.,* 125 Ill.2d 498, 127 Ill.Dec. 5, 532 N.E.2d 834 (1988), that an express warranty on a roofing system extends to a subsequent purchaser of the building). Moreover, Missouri case law holds that no particular form of words is necessary to accomplish an assignment, so long as there appears from the circumstances an intention on the one side to assign and on the other side to receive. *Keisker v. Farmer,* 90 S.W.3d 71, 74 (Mo. banc 2002). The evidence supports Crush's intention to assign the warranty and Renaissance's intention to receive it. The purported transfer of the T1055 took place soon after Crush's purchase. Crush and Uhlmann had spoken with Vermeer about the machine's possible defects. The warranty covered its repair or replacement in case of defects. A reasonable inference is that both assignor and assignee intended a potentially defective piece of equipment to remain covered by the warranty after its transfer to a new owner. Moreover, Renaissance continued to behave as though the T1055 were covered by the warranty after the purported transfer by seeking warranty repairs, and Great Plains continued to perform repairs as stipulated in the warranty. There is sufficient evidence to allow a jury to find that the warranty was assigned to Renaissance.

### (3) *Renaissance's Injury*

■■■ Even if a jury finds that Crush transferred ownership of the machine to Renaissance and also assigned the warranty, Renaissance still must show evidence of injury suffered through Vermeer's alleged breach. Renaissance alleges that it was injured by the failure of the terrain leveler to function properly. The leasing company attempts to show injury by citing Uhlmann's testimony that he lost business when the T1055 was not in operation:

> I was getting disheartened about the fact that this machine was not working. I was losing money. They weren't replacing it. Every time I was starting to use it, it wasn't doing what it said it would perform. It wasn't even close, kept breaking down repeatedly. It broke down. I had three customers, Emery Sapp, who is the largest construction people in the state, one of the largest people, Clarkson, which is the largest in Kansas City road construction, and a Mid–States Excavating, which is A1 Swearingen. Again, with our own property at 250—at 40 and 291, we would start, it would break down.

An injury to Uhlmann, however, is not the same as an injury to the company he created to protect Crush's assets from creditors; Uhlmann as an individual or as a member of Crush is distinct from Renaissance as a business entity. As stated above, the mere identity of members of two companies does not result in an identity of interest between the two entities. *See Blackwell Printing,* 440 S.W.2d at 437. Each company is a distinct legal entity with the right to own property, sue and be sued, contract, and acquire and transfer property. *See* §§ 347.061 and 347.063. Likewise, each entity must independently prove the elements of its claim and independently establish its own damages. Uhlmann's testimony that he himself was losing money is insufficient to show injury to Renaissance.

The record contains other evidence of injury to Renaissance, however. The sole business of Renaissance, as a leasing company, is to rent the equipment it owns; accordingly, the primary damages Renaissance could have suffered are a loss in rental income or a decrease in the rental value of the T1055. There was testimony

that, from the moment Renaissance allegedly obtained ownership of the T1055, it had continually leased the machine either to Crush, Mo–Kan, or TEAM. The record also includes two lease agreements: one to Crush, dated January 1, 2003, by which Renaissance leased back to Crush the equipment listed in an addendum, all of which purportedly was transferred to Renaissance in December; and a second to TEAM, dated June 3, 2004, by which Renaissance leased certain unspecified items to TEAM.[15] An item identified as "Vermeer" is listed in the addendum to the first lease, but no model or description is included. A reasonable inference is that "Vermeer" refers to the T1055. The addendum shows that Crush would owe no monthly rent for months one through six—that is, from January to June 2003—on approximately fifty vehicles, tools, and pieces of heavy equipment, including presumably the T1055. Starting in July 2003, Crush would owe a monthly rent of $44,143.09 until the thirty-third month.

■ There is evidence that Renaissance lost rental income because Mo–Kan—the renamed Crush—defaulted on its lease payments. First, Uhlmann testified that Mo–Kan was dissolved because it defaulted on its lease payments to Renaissance. Second, a letter notifying Mo–Kan members of a meeting to dissolve the company—dated September 2, 2003, about two months after the six-month rent-free peri-

od expired—specifies Mo–Kan's default as one reason for dissolution. Third, the document dissolving Mo–Kan stipulates that the company defaulted under the lease. And fourth, the agreement by which Uhlmann assigned Crush/Mo–Kan's liquidation proceeds to TEAM indicates that Mo–Kan defaulted on its lease payments to Renaissance. A reasonable inference is that Mo–Kan failed to make payments because the T1055 did not function as warranted.[16]

The facts underlying the element of injury are, therefore, controverted. On one hand, Renaissance has not shown that it lost business or business opportunities by being unable to rent the T1055. Nor has the company shown that it ever received any rent from Crush or TEAM. On the other hand, the record supports an inference that Renaissance lost rental income due to Mo–Kan's failure to pay rent because of the malfunctioning terrain leveler. Accordingly, Renaissance has provided sufficient evidence of injury. Summary judgment on Renaissance's claim for breach of express warranty was improper.

### (B) TEAM's Claim for Breach of Express Warranty

TEAM, like Renaissance, asserts a breach of express warranty claim against Vermeer.[17] It contends that, upon dissolution of Crush/Mo–Kan, Uhlmann assigned to TEAM his rights to Crush's breach of

---

**15.** For the second lease, there is no attached schedule or addendum indicating what equipment was leased by TEAM.

**16.** For strategic reasons, the parties have pleaded and briefed this case on a somewhat superficial basis. This Court is required to affirm an order of summary judgment under any theory supported by the record. This Court also is required to accord the non-moving party the benefit of all reasonable inferences in the record. The effect of these sometimes competing requirements is most evident in this opinion's analysis of the plain-

tiffs' injuries. The parties may wish to amend their pleadings and more specifically address certain claims, defenses, and evidence prior to trial. There may well be issues open to summary judgment or other type of pre-trial disposition.

**17.** The parties do not raise, and this Court does not discuss, the issues of consistent/inconsistent claims, election of claims or remedies, or duplicative recovery among the various party plaintiffs.

express warranty claims, thereby giving TEAM the right to assert such claims against Vermeer. For this claim, as for Renaissance's claim for breach of express warranty, only the element of injury was contested. To defeat summary judgment, TEAM must show that (1) Uhlmann had authority to assign the warranty claims to TEAM, (2) a valid assignment of the claims to TEAM occurred, and (3) the original holder of the claims—Crush—suffered harm through Vermeer's alleged breach.

(1) *Uhlmann's Authority to Assign Warranty Claims to TEAM*

The first issue is whether evidence supports Uhlmann's authority to assign any warranty claims belonging to Crush. The "Amended and Restated Operating Agreement" for Crush indicates that Uhlmann became a 92.5 percent Crush member in 2002. The terms of the operating agreement permitted Uhlmann, as the holder of a super-majority interest, to dissolve Crush/Mo–Kan. On September 18, 2003, the remaining members of Mo–Kan agreed to dissolve the company and adopted a dissolution plan by which liquidation proceeds were distributed to members according to their capital account balances. Uhlmann was the only member with a positive capital account balance. Under the terms of the operating agreement, all liquidation proceeds including any rights of action—were distributed to Uhlmann.

■ However, Vermeer disputes Uhlmann's authority to assign any claims associated with the T1055. First, the manufacturer argues that Gary and Terry Watts never signed the amended and restated operating agreement, so that Uhlmann was never made a member of Crush. Second, it contends that the Watts brothers did not sign the dissolution agreement for Mo–Kan, so that Uhlmann never was entitled to receive Mo–Kan's liquidation proceeds. Vermeer points to testimony from Gary Watts that his and his brother's signatures were forged. But there is contrary testimony verifying Gary Watts' signature on proxy documents. In addition, the Wattses' signatures would be available on Crush's initial operating agreement as exemplars. The genuineness of a contested signature is an issue for the jury. *See International Harvester Credit Corp. v. Formento,* 593 S.W.2d 576, 579 (Mo.App. 1979); *see also* § 490.640 ("Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute."). Giving plaintiffs the benefit of all reasonable inferences, there is evidence to support Uhlmann's contention that he had the authority to assign Crush's warranty claims to TEAM.

(2) *Assignment of Warranty Claims to TEAM*

■ The next inquiry is whether there was a valid assignment of Crush's warranty claims to TEAM. TEAM argues that it was assigned the right to damages belonging to Crush—as immediate purchaser and original party to the contract—after Uhlmann received the right as part of Crush's liquidation proceeds. The difference between TEAM's and Renaissance's breach of express warranty claims is that Renaissance purportedly was assigned the *warranty* itself, with a present right of recovery for an existing breach, whereas TEAM was assigned Crush's *action* for breach of express warranty, which gives a present right of recovery for a past breach. The present question, then, is whether a right to damages for breach of express warranty arising from the sale of personal property

128

may be assigned to a party not in privity of contract.

■ Section 2–210 of the Missouri UCC authorizes the assignment of a right to damages for contractual breach. The section provides, in pertinent part, as follows: "A *right to damages for breach of the whole contract* or a right arising out of the assignor's due performance of his entire obligation *can be assigned* despite agreement otherwise." § 400.2–210.2 (emphasis added). Although Missouri courts have not addressed specifically whether this right to damages for contractual breach contemplates express warranties, the case law in other jurisdictions is persuasive. The Illinois Supreme Court, interpreting a version of UCC section 2–210 identical to Missouri's, has held that where warranty claims have been formally assigned to a successor buyer, an express warranty that is not limited to the first purchaser gives an assignee the right to sue for purely economic loss and consequential damages, even though original vertical privity is absent. *Collins*, 127 Ill. Dec. 5, 532 N.E.2d at 843. In *Collins*, the original purchaser of a commercial warehouse received an express warranty from the roofing manufacturer against leakage for ten years. When the warehouse was sold to a subsequent purchaser within the warranty period, the owner formally assigned to the purchaser any rights and causes of action under the manufacturer's warranty. *Id.*, 127 Ill.Dec. 5, 532 N.E.2d at 835–36. Here, as in *Collins*, there was a document assigning to TEAM any rights of action belonging to Crush, although the document did not specifically mention Vermeer's limited warranty. On June 3, 2004, Uhlmann, Mo–Kan, and TEAM entered into an agreement by which Uhlmann assigned to TEAM all of his rights and interests in Crush/Mo–Kan's liquidation proceeds. Nothing in the written warranty

prohibited assignment of the warranty claim. Under section 400.2–210.2, assignments are encouraged unless the parties expressly provide otherwise. *See* 1 Clark & Smith, *The Law of Product Warranties* § 10–12. Giving TEAM the benefit of all reasonable inferences, the evidence is sufficient for a jury to find a valid assignment of Crush's warranty claims to TEAM.

**(3)** *TEAM'S Injury*

■ TEAM contends that it was assigned Crush's—the original purchaser's—claim for breach of express warranty. The only rights or interests an assignee acquires are those the assignor had at the time the assignment was made. *Barker v. Danner,* 903 S.W.2d 950, 955 (Mo. App.1995). Because an assignee merely steps into the shoes of the assignor, an *assignee* must allege facts showing that the *assignor* would be entitled to relief. *Louisiana Farmers' Protective Union v. Great Atlantic & Pac. Tea Co. of America, Inc.,* 131 F.2d 419, 423 (8th Cir.1942); *see also Adams v. Cossa,* 294 S.W.3d 101, 105 (Mo.App.2009) ("An assignee steps into the shoes of its assignor; it acquires no greater rights than those held by the assignor at the time of the assignment."). According to the plaintiffs, Renaissance owned the T1055 and was assigned the warranty on it. TEAM never owned the T1055 but later was assigned Crush's right of action for breach of express warranty. Therefore, Renaissance must plead and prove that it suffered harm due to Vermeer's breach. TEAM, on the other hand, must plead and prove that Crush suffered harm due to Vermeer's breach. TEAM fails to do so.

In its petition, TEAM alleges that its actual damages include lost business, lost business opportunities, lost profits, and expenses. It does not plead or attempt to prove any injury to Crush. Instead, it merely cites Uhlmann's testimony about

how he was injured. As stated in the previous section, each entity must independently prove the elements of its claim and independently establish its own damages. Uhlmann's testimony that he himself was losing money is insufficient to show injury to Crush. TEAM fails to show the harm Crush suffered as a result of the T1055's alleged failure to function as warranted.[18] Summary judgment in favor of Vermeer on TEAM's breach of express warranty claim is proper.[19]

### 2. Breach of Implied Warranties

In addition to their breach of express warranty claims against the manufacturer, Renaissance and TEAM bring breach of implied warranty claims against the dealer.[20] They argue that Great Plains breached the implied warranties of merchantability and fitness for a particular purpose because the T1055 was fit neither for its ordinary purpose of terrain leveling nor for its particular purpose of rock excavation in a limestone quarry. Even though neither plaintiff was a party to the sales contract with Great Plains, they contend they are entitled to relief for the implied warranty claims under the same theories that would allow them to recover for the express warranty claims—namely, that Crush either transferred the T1055 and its warranty to Renaissance or later distributed its warranty claims to Uhlmann, who then assigned them to TEAM.

### (A) Renaissance's Claims for Breach of Implied Warranty

■ Renaissance was not in privity with Great Plains—which sold the T1055 to Crush—but attempts to bring suit under the proposition that implied warranties extend to remote purchasers. Under Missouri law, a remote purchaser may bring suit against the manufacturer for breach of implied warranties. *See Collegiate Enterprises, Inc. v. Otis Elevator Co.*, 650 F.Supp. 116, 118 (E.D.Mo.1986); *Morrow v. Caloric Appliance Corp.*, 372 S.W.2d 41, 55 (Mo. banc 1963); *Ragland Mills, Inc. v. General Motors Corp.*, 763 S.W.2d 357, 360 (Mo.App.1989); *Groppel Co., Inc. v. U.S. Gypsum Co.*, 616 S.W.2d 49, 58 (Mo.App. 1981). However, Missouri law does not permit a subsequent or second-hand purchaser to sue the *seller* in the original sale—to which the subsequent purchaser was not a party for breach of implied warranty.

■ An implied warranty arises by operation of law and must be applied in a reasonable sense. *Horner v. David Distributing Co.*, 599 S.W.2d 100, 103 (Mo. App.1980). Warranties are implied for each transaction according to the presumed intention of the parties. *Id.* at 102. In this case, it could only be implied that Great Plains would warrant the T1055 to be fit for its ordinary or particular purpose at the time of its sale to Crush. The dealer would be incapable of warranting its

---

18. The difference between Renaissance's and TEAM'S alleged injuries is that the record contains specific evidence of Mo–Kan defaulting on its rent payments to Renaissance. It does not contain sufficient evidence to justify a reasonable inference that Crush was injured by the nonconforming good.

19. TEAM could have asserted the breach of warranty claims afforded to it as a lessee under article 2A of the UCC but failed to allege any claims against lessor Renaissance.

20. In their petition, the plaintiffs bring breach of implied warranty claims against Vermeer as well as Great Plains. They concede in their briefs, however, that the written warranty between Crush and Vermeer expressly disclaims all warranties of merchantability and fitness, and then they argue the implied warranty claims only against Great Plains.

fitness at the time of its subsequent sale to an unrelated party not in existence when Great Plains executed the sales contract with Crush. It would be unreasonable to imply a warranty under this scenario. Any claim that Renaissance has for breach of implied warranty would be against Crush, the immediate party from which it purchased or received the T1055, not against Great Plains. *See Worthey v. Specialty Foam Products, Inc.*, 591 S.W.2d 145, 148 (Mo.App.1979) (a claim for breach of the implied warranty of merchantability may be brought against the seller of a used truck). The company's implied warranty claims against Great Plains fail as a matter of law.

**(B) TEAM's Claims for Breach of Implied Warranty**

▆▆▆ In its implied warranty claim, TEAM does not encounter the same privity problem as Renaissance because it seeks recovery against Great Plains on the theory that it was assigned Crush's right of recovery for breach of implied warranty. When the plaintiff has been assigned the warranty claims of a buyer who is in privity with the seller, an action for recovery of economic loss based on breach of implied warranty is not barred by lack of vertical privity. *See, e.g., Ashley Square, Ltd. v. Contractors Supply of Orlando, Inc.*, 532 So.2d 710, 711 n. 1 (Fla.App.1988). Crush was in privity with Great Plains, the seller. As discussed above, the evidence is sufficient for a jury to find a valid assignment of Crush's warranty claims to TEAM. TEAM may bring implied warranty claims under the same theory of assignment discussed in the section on express warranties.

▆▆▆ Section 2–314 of the UCC creates an implied warranty of merchantability, which warrants that goods must be at least "fit for the ordinary purposes for which such goods are used." § 400.2–314.2(c).

Section 2–315 creates an implied warranty of fitness for a particular purpose, which applies "[w]here the seller at the time of contracting has reason to know of any particular purpose for which the goods are required and ... the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." § 400.2–315. To recover for breach of either of these implied warranties, a plaintiff must prove that the buyer was injured by the defective nature of the goods. *Ragland Mills*, 763 S.W.2d at 360. Here, Crush was the immediate buyer and TEAM the alleged assignee. Because an assignee merely steps into the shoes of the assignor, TEAM must allege facts showing that Crush would have been entitled to relief. *Louisiana Farmers' Protective Union*, 131 F.2d at 423. As in its express warranty argument, TEAM fails either to plead or to prove that Crush was injured by the defective nature of the terrain leveler. Summary judgment for Great Plains was proper on the implied warranty claims of both plaintiffs.

**3. Breach of Contract**

▆▆▆ Renaissance and TEAM also assert that they are able to collect against Great Plains on a breach of contract theory. The alleged breach of contract was premised on the claim that the T1055 was expected to "accomplish terrain leveling" but "would not perform these tasks." The plaintiffs assert that the breach of contract claim was owned by Crush—as the retail purchaser—and was transferred either to Renaissance when the machine was conveyed or to TEAM when Crush/Mo–Kan was dissolved and the liquidation assets were distributed to Uhlmann, who then transferred them to TEAM.

▆▆▆ Under Missouri law, remedies for economic loss sustained by reason of damage to or defects in products sold are

limited to those under the warranty provisions of the UCC. *Wilbur Waggoner Equipment & Excavating Co. v. Clark Equipment Co.*, 668 S.W.2d 601, 602 (Mo. App.1984). The UCC recognizes that breach of contract and breach of warranty are not the same cause of action. The remedies for breach of contract are set forth in section 2–711 and are available to a buyer "[w]here the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance." § 400.2–711.1. The remedies for breach of warranty are set forth in section 2–714 and are available to a buyer who has finally accepted goods, but discovers that the goods are defective in some manner. § 400.2–714; *see also* 1 White & Summers, *UCC* 702–3 ("We believe that only buyers who have accepted and neither rightfully rejected nor effectively revoked can use 2–714."). Here, the plaintiffs do not assert that Great Plains failed to make delivery or repudiated or that Crush rightfully rejected or justifiably revoked acceptance. There is no dispute that Crush accepted delivery of the T1055 and notified Great Plains about the machine's inability to perform terrain leveling adequately. Accordingly, Renaissance and TEAM cannot recover under section 400.2–711 for breach of contract.[21] Their contract claims are subsumed by their breach of warranty claims for damages under section 400.2–714, which already have been addressed above. Plaintiffs' breach of contract claims fail as a matter of law.

### B. FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS

In their second point relied on, Uhlmann and TEAM argue that summary judgment

for Vermeer on the fraudulent and negligent misrepresentation claims was improper because (a) Uhlmann was harmed directly by Vermeer's misrepresentations to him individually, (b) TEAM was assigned any misrepresentation claims belonging to the original purchaser, and (c) material facts exist showing that Uhlmann and TEAM can establish each element of their fraudulent and negligent misrepresentation claims.

Those claims are based on two representations allegedly made by Vermeer to Crush and Uhlmann. As stated in the plaintiffs' petition, the first representation occurred when Vermeer—prior to Crush's purchase of the T1055 and in order to induce the purchase—allegedly told Crush and Uhlmann that the T1055 would perform terrain leveling and surface mining. The second representation occurred when Vermeer, after the purchase, allegedly told Crush and Uhlmann that the machine could be repaired or fixed so that it could perform terrain leveling as represented prior to sale and as represented in the advertising. Because the two representations giving rise to both the fraud and the negligent misrepresentation claims are separate and distinct, each representation will be discussed in turn.

#### 1. *Fraud*

The elements of fraudulent misrepresentation are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's

---

21. The United States Supreme Court has noted the distinction between a breach of warranty and breach of contract claim: "[A] claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract." *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury. *Larabee*, 271 S.W.3d at 546. A plaintiff's failure to establish any one of the essential elements of fraud is fatal to recovery. *Verni v. Cleveland Chiropractic College*, 212 S.W.3d 150, 154 (Mo. banc 2007). Because the reliance element is dispositive for the first representation and the falsity element is dispositive for the second representation, only those elements will be discussed.

### (A) Uhlmann's Claim for Fraud against Vermeer

#### (1) First Representation

■■■■ The first representation alleged is that the T1055 would perform terrain leveling and surface mining. For this representation, the reliance element is dispositive. Generally, whether a party has justifiably relied on a misrepresentation is an issue of fact for the jury to decide. *Monsanto Chemical Works v. American Zinc, Lead & Smelting Co.*, 253 S.W. 1006, 1010 (Mo.1923). Vermeer attempts to show that Uhlmann did not rely on Vermeer's statements because he decided that Crush should purchase the T1055 on the recommendation of Crush's president and not on any representations by Vermeer. The manufacturer points to Uhlmann's deposition testimony that, prior to the purchase of the terrain leveler, he did not personally have any discussions with representatives of either Vermeer or Great Plains. There is evidence that he viewed a "Monster Machines" video produced and broadcast by The Learning Channel, not by Vermeer, and that the video Uhlmann viewed was copied by Jeff Hall directly from The Learning Channel.

Moreover, there is evidence that the show was not broadcast until November 2002, after Crush's purchase of the terrain leveler. Vermeer also points to testimony that Uhlmann did not obtain any written promotional materials that might have constituted misrepresentations until after the T1055 had been purchased.

This evidence is disputed by Uhlmann, who points to testimony that he relied on the truth of Vermeer's representations before deciding to make or guarantee loans for the purchase of the T1055. He testified that he saw a promotional video produced by Vermeer prior to the purchase date. He testified that, while he decided to purchase the T1055 on the recommendation of Crush's president, Jeff Hall, that recommendation was not the sole basis for his decision. Uhlmann also stated that he picked up promotional materials when he visited Vermeer headquarters in October, prior to completion of the purchase. This evidence shows a genuine dispute of a material fact on the reliance issue.

■■■■ Despite the general rule that reliance is a fact issue for the jury, a party who undertakes an independent investigation does not have the right to rely on the misrepresentations of another. *Brown v. Bennett*, 136 S.W.3d 552, 556 (Mo.App. 2004). Vermeer asserts that—as a matter of law—Crush and Uhlmann waived their right to rely on Vermeer's representations in deciding to purchase the machine because Crush conducted its own evaluation of the machine during the two-month demonstration period at the quarry. Vermeer is correct. Although there are three exceptions to the investigation rule, none of the exceptions applies. The three exceptions are: (1) the investigating party makes only a partial investigation and relies on both the results of the inspection and the misrepresentation; (2) the buyer lacks equal footing for learning the truth,

and the facts are not easily ascertainable but are peculiarly within the knowledge of the seller; and (3) the seller makes a specific and distinct misrepresentation. *Id.* First, Uhlmann and Crush made a full examination because they discovered the defect in the machine's ability to excavate hard limestone prior to purchase. Second, the fact that the machine experienced problems with surface mining was easily ascertainable. Third, the plaintiffs do not allege that Vermeer made a specific misrepresentation distinct from the one at issue. Because none of the three exceptions applies, as a matter of law Uhlmann cannot show that he relied on the truth of the first representation prior to purchase.

### (2) Second Representation

▮▮▮ The second representation alleged is that the terrain leveler could be repaired or fixed so that it could perform terrain leveling as represented prior to sale and as represented in the advertising. For this representation, the falsity element is dispositive. The truth or falsity of representations for purposes of a fraud claim is judged "in the light of the meaning which the plaintiffs would reasonably attach to them in existing circumstances and the words employed must be considered against the background and in the context in which they were used." *Haberstick v. Gordon A. Gundaker Real Estate Co.,* 921 S.W.2d 104, 109 (Mo.App.1996). Uhlmann argues that the second representation was false because the T1055 could not be repaired or redesigned so that it would cut and excavate hard rock. "The truth or falsity of the representation must be determined as of the time it was made and as of the time it was intended to be, and was, relied upon and acted upon." *Powers v. Shore,* 248 S.W.2d 1, 6 (Mo. banc 1952). Vermeer's alleged statement that it would repair or redesign the machine is a statement of intent. When a fraud claim is based on a statement of intent, the plaintiff establishes falsity by showing that when the statement was made, the speaker did not intend to perform consistently with the statement. *Jacobs Mfg. Co. v. Sam Brown Co.,* 19 F.3d 1259, 1263–64 (8th Cir. [Mo.] 1994). Absent such an inconsistent intent, there is no misrepresentation of fact or state of mind but only a breach of promise or failure to perform. *Paul v. Farmland Industries, Inc.,* 37 F.3d 1274 (8th Cir. [Mo.] 1994).

Numerous work order invoices and warranty claim forms document Vermeer's attempts to perform consistently with this statement. The fact that Vermeer continuously attempted to fix the terrain leveler over the course of the warranty period undermines the allegation that the manufacturer did not intend to repair or redesign the machine to function as advertised. Uhlmann presents no facts or circumstances that, if believed, would allow a jury to find that Vermeer knew its representations were false when made. Uhlmann's evidence speaks only to whether the T1055 actually was repaired or redesigned to cut hard rock, not—as it should have—to whether Vermeer intended to fix the machine at the time the representation was made. Giving Uhlmann the benefit of all reasonable inferences, there is insufficient evidence for a jury to find that Vermeer's alleged representation about repairing the T1055 was false when it was made. The failure of performance does not establish intent. *Paul,* 37 F.3d at 1277 ("It is not enough that for any reason, good or bad, the speaker changes his mind and fails or refuses to carry his expressed intention into effect."). Because Uhlmann failed to produce any evidence that Vermeer did not intend to perform consistently with its statement, there is no genuine issue for trial regarding the second representation.

Uhlmann has failed to establish one of the essential elements of fraud for each of the alleged misrepresentations, which is fatal to recovery for a fraud claim based on either one. *See Verni*, 212 S.W.3d at 154. Summary judgment for Vermeer on Uhlmann's fraud claim was proper.

**(B)** *TEAM's Claim for Fraud against Vermeer*

■ TEAM argues that any fraud claims capable of being asserted by Crush were distributed to Uhlmann upon the dissolution of Crush/Mo–Kan and then assigned by Uhlmann to TEAM. An action for fraud and deceit is assignable when the injury affects the estate or arises out of contract. *Gremminger v. Missouri Labor & Indus. Relations Comm'n*, 129 S.W.3d 399, 403 (Mo.App.2004).

The analysis for TEAM'S fraud claim is the same as the analysis for Uhlmann's because any alleged misrepresentations were made simultaneously to Crush and to Uhlmann. For the first representation, the reliance element is dispositive because, as a matter of law, TEAM cannot show that Crush relied on its truth prior to purchase. For the second representation, the falsity element is dispositive because TEAM failed to produce any evidence that Vermeer did not intend to perform consistently with its statement. TEAM, like Uhlmann, has failed to establish one of the essential elements of fraud for each of the alleged misrepresentations. Its fraud claim fails. Summary judgment for Vermeer on TEAM'S fraud claim was proper.

**2.** *Negligent Misrepresentation*

■ Uhlmann and TEAM base their negligent misrepresentation claims on the same two representations that gave rise to their fraud claims. The elements of negligent misrepresentation are: (1) the speaker supplied information in the course of his business; (2) because of the speak-er's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss. *Dancin Development, L.L.C. v. NRT Missouri, Inc.*, 291 S.W.3d 739, 744 (Mo.App.2009). A party must prove every element of a claim for negligent misrepresentation for the claim to succeed. *Id.*

**(A)** *Uhlmann's Negligent Misrepresentation Claim against Vermeer*

**(1)** *First Representation*

For the representation that the T1055 could perform terrain leveling and surface mining, the analysis is the same as for Uhlmann's fraud claim. Because the plaintiffs undertook an independent investigation and no exceptions apply, Uhlmann cannot satisfy the element of reliance as a matter of law.

**(2)** *Second Representation*

■ Vermeer challenges three elements of the negligent misrepresentation claim based on its statement that the T1055 could be repaired or redesigned to perform terrain leveling: falsity, particular business transaction, and reliance. A claim for negligent misrepresentation, unlike one for fraud, does not involve a question of intent. Rather, such a claim is premised on the theory that the speaker believed the information supplied was correct but was negligent in so believing. *Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 689 (Mo.App.1994). To establish falsity, Uhlmann must show that the statement that the T1055 could be repaired or redesigned to perform terrain leveling was false because of Vermeer's

failure to use reasonable care.[22] The fact that the terrain leveler was not successfully repaired or redesigned is amply documented by the work order invoices and warranty claim forms over the course of the warranty period. In addition, the plaintiffs' engineering expert testified that the machine was defective because it was subject to excessive vibration and permanent deformation when used to cut hard rock. He testified that 44 percent of all Vermeer terrain levelers were discontinued or "scrapped out," while the norm for off-highway vehicles is 0.5 percent per year. The expert concluded that Vermeer failed to conduct adequate testing on the design of the T1055 prior to selling it. This evidence, if believed, is sufficient to show that the statement that the T1055 could be repaired or redesigned to perform terrain leveling was false because of Vermeer's negligence.

As to the second challenged element, Vermeer argues that it did not provide information for plaintiffs' guidance because the only business transaction in which it was involved related to its sale of the T1055 to its distributor Great Plains and that this transaction was completed prior to any alleged misrepresentations. However, privity is not required to establish a negligent misrepresentation claim. *Miller v. Big River Concrete, LLC,* 14 S.W.3d 129, 134 (Mo.App.2000). Rather, the plaintiffs must establish that they were part of a limited group for whose guidance the information was provided. *Id.* Here, Crush and Uhlmann were part of the limited group considering whether to purchase the T1055. There is evidence that Uhlmann and members of Crush met not only with Great Plains salespeople but also with Vermeer representatives regarding the

sale of the T1055, both before the sales contract was executed and before the final payment was made. The sale of the terrain leveler constitutes a "particular business transaction." Moreover, there is evidence to support a finding that Vermeer knew Uhlmann and Crush were relying on their representations, including those made at Vermeer headquarters before the final payment for the T1055, and could foresee the harm to them if the statements were inaccurate. Privity is not necessary under these circumstances. The evidence is sufficient to show that Vermeer made representations to Uhlmann and Crush about the capabilities of the T1055 in the context of the "particular business transaction" of the machine's sale, even if the sales order was executed with Great Plains alone.

Uhlmann also must establish his reliance on Vermeer's statement that the T1055 could be repaired or redesigned. Uhlmann's testimony that the final payment of $70,000 was conditioned on this statement shows a genuine issue of material fact for this element. Moreover, as a matter of law, Uhlmann and Crush did not waive their right to rely on Vermeer's second representation by observing the T1055 during the demonstration period. The first two exceptions to the inspection rule apply. First, there is sufficient evidence for a jury to conclude that the demonstration in the quarry was only a partial inspection because it failed to reveal conclusively whether the terrain leveler could be repaired or redesigned to perform terrain leveling. Second, there is sufficient evidence for a jury to conclude that Uhlmann and Crush lacked equal footing for learning the truth of whether the terrain leveler could be repaired or redesigned to perform

---

**22.** The falsity element of fraud relates to a speaker's reckless disregard of the truth or falsity of the statement as opposed to a speaker's negligent failure to exercise reasonable care or competence to ensure that truthful information is being relayed. *See Huttegger v. Davis,* 599 S.W.2d 506, 514 (Mo. banc 1980) (Welliver, J., dissenting).

terrain leveling because this fact was not easily ascertainable and was peculiarly within the knowledge of the machine's manufacturer, a company that specialized in heavy mining and rock-cutting equipment. A genuine dispute exists about whether Uhlmann relied on the truth of Vermeer's second representation.

Uhlmann has provided sufficient evidence to establish each of the challenged elements for his negligent misrepresentation claim. Summary judgment for Vermeer on this claim was improper.

**(B)** *TEAM's Negligent Misrepresentation Claim against Vermeer*

 As with its warranty claims, TEAM fails either to plead or to prove that Crush was injured due to its reliance on Vermeer's second representation. Accordingly, it is unable to establish all of the essential elements of negligent misrepresentation. Vermeer is entitled to summary judgment on TEAM'S claim.

### C. Excessive Costs

In their third point relied on, the plaintiffs dispute the trial court's grant of excessive costs to the defendants under Rule 57.03(c)(6). Because the case is remanded, there is no final grant of costs.

### V. Conclusion

The grant of summary judgment in favor of Vermeer on Renaissance's breach of express warranty claim is reversed, as is the grant of summary judgment in favor of Vermeer on Uhlmann's negligent misrepresentation claim. The judgment with respect to costs is vacated. In all other respects the judgment is affirmed. The case is remanded.

All concur.