The CONSUMERS COOPERATIVE ASSOCI-
ATION, a Corporation, Appellant,

v.

Edwin L. McMAHAN, Defendant,

Howard C. Blue and Paul A. Jordan, Trus-
tees for the Kansas City Underground
Industrial Center, Inc., Respondents.

No. 50968.

Supreme Court of Missouri,

Division No. 2.

July 12, 1965.

Motion for Rehearing or to Transfer to
Court En Banc Denied Sept. 13, 1965.

Rodger J. Walsh, Kansas City, Rafter, Biersmith, Miller & Walsh, Kansas City, of counsel, for appellant.

William H. Sanders, Dean F. Arnold, William W. La Rue, Kansas City, George W. Harlan, Jr., Kansas City, Caldwell, Blackwell, Sanders & Matheny, Kansas City, of counsel, for respondents.

STORCKMAN, Judge.

This is an action for damages in the sum of $18,808.45 alleged to have been suffered when baling wire stored with the Kansas City Underground Industrial Center, Inc., became rusty. The Kansas City Underground Industrial Center, Inc., was a licensed warehouse company incorporated under the laws of Missouri. Its charter was forfeited, however, for failure to file annual reports, and the action proceeded against the last officers and members of the board of directors as trustees for the defunct corporation. One of them, Edwin L. McMahan, was not served and the action was dismissed as to him at the trial. The trial proceeded against the remaining defendants, Howard C. Blue and Paul A. Jordan. The trial court overruled the defendants' motion for a directed verdict filed at the close of all of the evidence. The jury's verdict was for the defendants. The plaintiff's motion for a new trial was overruled and it appealed.

The points relied on by plaintiff are that the trial court erred in giving defendants' instruction No. 3 relating to the burden of proving negligence and defendants' instruction No. 4 regarding contributory negligence, and in refusing to give instructions Nos. 8, 9 and 10 offered by the plaintiff.

The errors assigned, however, become immaterial in the view we take of the case which is that the evidence in its most favorable aspect would not support a verdict for the plaintiff.

The plaintiff's action is based on negligence. The petition alleges that "the plaintiff entered into an oral contract with said warehouse corporation under and by the terms of which said warehouse corporation agreed to store as a duly licensed public warehouseman 5,543 cartons of baling wire for said plaintiff"; that the agents of the warehouse company represented to the plaintiff "that the humidity in its storage facilities was such that no rust would develop on said baling wire" when in truth and fact the storage facilities were totally inadequate for the storage of baling wire; that the defendants "did negligently store said baling wire, the negligence consisting of a failure to provide low humidity storage facilities"; and that the warehouse corporation did not exercise that degree of care which a reasonably careful man would exercise in regard to similar goods of his own.

The answer of the defendants Blue and Jordan admitted that the plaintiff stored the baling wire in the warehouse but denied each and every other allegation of the petition. The answer further pleaded contributory negligence and assumption of risk in that the condition of the warehouse and its suitability for the storage of the baling wire was known to the plaintiff prior to and during the time the wire was stored in the warehouse.

There was no essential conflict in the testimony of the witnesses. The defendants offered no evidence. The evidence adduced disclosed that the defendants, McMahan, Blue, and Jordan, had organized a licensed warehouse company under the name of Kansas City Underground Industrial Center, Inc. Mr. McMahan, the president, had been in the food brokerage and transportation business. Mr. Blue, the vice-president, and Mr. Jordan, the secretary-

treasurer, were both connected in an official capacity with the Kansas City Quarries and Kansas City Concrete Company. The warehouse company leased an underground limestone quarry or artificial cave which it proposed to use for storage purposes. The cave located in Jackson County was about 100 feet underground; it had a constant temperature of about 55 degrees and occupied an area of about 60 acres.

Mr. McMahan called on Ray J. Barry, plaintiff's director of Farm Supplies Division, and solicited storage business. As a part of its business, the plaintiff bought and sold large quantities of baling wire. At the time Mr. McMahan called on Mr. Barry in 1959, the plaintiff had purchased from a manufacturer in Belgium approximately 18,000 cartons of baling wire. The delivered price was cheaper than that obtainable in the United States. The wire was transported by ship from Belgium to the Port of Houston, Texas, and from there to Kansas City overland by truck. All but about 5500 cartons was sold immediately or put in the plaintiff's own storage facilities. Mr. Barry became interested in the artificial cave as a storage place for the remaining cartons of baling wire. The discussion between him and Mr. McMahan, to the extent necessary, will be mentioned later. Shortly after the first contact, Mr. Barry and two other representatives of the plaintiff went to the cave, inspected it, and decided to store the remainder of the baling wire there. This was done in July or August 1959. In September 1959 Mr. McMahan had a nervous breakdown. About June 1, 1960, some of the cartons were taken from storage and sent to a customer in Nebraska and the wire was found to be spotted or streaked with rust to an extent that it was not usable in a baler. The wire remained in the cave until December 1960 or January 1961 when the plaintiff sold it at a reduced price and brought suit for the loss.

The plaintiff's verdict-directing instruction was quite general but we will set it out for whatever light it may shed on the theory by which the plaintiff sought to impose liability on the defendants.

It is as follows:

"The Court further instructs the jury that if you find and believe that on or about August 31, 1959, the plaintiff entered into an agreement with the Kansas City Underground Industrial Center, Inc., a warehouse corporation, by which the said warehouse corporation accepted for storage as a duly licensed public warehouseman 5,543 cartons of bailing wire for the plaintiff, and if you find said warehouse corporation did not exercise ordinary care in the storing of said bailing wire in that said warehouse corporation failed to exercise that degree of care which a reasonably careful man would exercise in regard to similar goods of his own then your verdict must be for the plaintiff and against the defendants the statutory trustees of said warehouse corporation, provided the plaintiff exercised ordinary care under the circumstances mentioned in evidence."

The evidence shows that plaintiff's agents who inspected the storage facility knew it was a mined-out quarry in a rough condition with limestone walls and ceilings with pillars of limestone left in place for support; that the floors were dirt and limestone covered with dust. They further knew there was no heat in the quarry or no mechanical means of controlling humidity. The baling wire was not galvanized but it had a light film of oil; it was sealed in waxed paper and then enclosed in a double carton which was sealed. The cartons of wire were placed in the storage cave in this condition and there is no showing that the warehouse company was obliged to inspect the wire in the cartons or to service it in any manner while it was in storage. In April 1960, Cecil Brainard, the manager of the plaintiff's Internal Audit Department, took a physical inventory of the merchandise in storage. He testified there

was no visible deterioration of the cartons and there was no deterioration due to moisture. So far as the evidence shows, the temperature and atmospheric conditions in the quarry remained the same as it was when plaintiff's agents inspected it before deciding to use it for storage.

■ To constitute actionable negligence three essential elements must exist: (1) a duty or obligation on the defendants' part to protect the plaintiff or his property from injury, (2) a failure to discharge such duty, and (3) injury proximately resulting from such failure. Atcheson v. Braniff International Airways, Mo., 327 S.W.2d 112, 117 [8]; Wolfmeyer v. Otis Elevator Co., Mo., 262 S.W.2d 18, 21[1]; Whealen v. St. Louis Soft Ball Ass'n, 356 Mo. 622, 202 S.W.2d 891, 894 [7]. Our first concern is to determine the duty or obligation imposed on the defendants by the contract or storage agreement. Specifically a duty or obligation to protect the baling wire from becoming rusty must be established.

■ In some parts of the testimony and especially its verdict-directing instruction it appears that the plaintiff was depending on a duty or obligation imposed by law, that is, by Chapter 406, RSMo 1959, V.A.M.S. dealing with uniform warehouse receipts and related matters. Section 406.030 prescribes the essential terms of warehouse receipts, none of which are relevant in this case. Section 406.040 provides the receipt may contain other terms and conditions if they are not contrary to the requirements of the chapter and do not impair the warehouseman's duty of care. In case the warehouseman fails or refuses to deliver the property on demand, § 406.090 places on him the burden of showing a lawful excuse for such refusal. This section is not dispositive of this case because the property was delivered to the owner although it was damaged by having become rusty. Section 406.210 defines the degree of care required in case of injury but it exempts the warehouseman from liability, in the absence of an agreement to

the contrary, if the injury to the goods could not have been avoided by the exercise of such care "as a reasonably careful owner of similar goods would exercise." But again this does not prescribe the entire duty or obligation assumed by the defendants under the storage or bailment agreement. Finally, § 406.560 provides that: "In any case not provided for in this chapter, the rules of law and equity, including the law merchant, and in particular the rules relating to the law of principal and agent and to the effect of fraud, misrepresentation, duress or coercion, mistake, bankruptcy, or other invalidating cause, shall govern." It is apparent that the statutes do not purport to impose absolute liability or liability without fault on the warehouseman.

"A contract of storage of property in a warehouse is generally governed as to its requisites and validity by the rules relating to contracts, particularly those relating to contracts of bailment, except to the extent that it is controlled by the statutes regulating such contracts." 93 C.J.S. Warehousemen & Safe Depositaries § 12a, p. 406. "The construction and operation of a contract of storage are governed by the intention of the parties as derived from the terms of the agreement and as construed in the light of the circumstances surrounding the transaction, in connection with the provisions of the warehouse receipt, where one is given, and the governing statute." 93 C.J.S., Warehousemen & Safe Depositaries § 12c, p. 408. These statements are consistent with the provisions of Chapter 406 and especially §§ 406.040 and 406.560.

■ Unless a warehouseman has been guilty of specific negligence contributing to the loss or injury, he is not liable for damages due to an inherent defect in the stored goods or where the goods are of such a nature that they would tend to deteriorate from natural causes. 93 C.J.S. Warehousemen & Safe Depositaries § 44, p. 468, and § 76b(2) (c), p. 520. A corollary of this rule is that a warehouseman is not, in the absence of a contract or a statute so pro-

viding, an insurer of the safety of the merchandise stored. 56 Am.Jur., Warehouses § 127, p. 378.

Turning now to a duty or obligation imposed by contract or agreement, the plaintiff relies heavily on statements made by Mr. McMahan that the atmospheric conditions in the cave were such that baling wire would not rust while in storage. Eugene A. Ross, an employee of the plaintiff engaged at the time in buying and selling steel products, testified that Mr. McMahan assured him that the humidity in the artificial cave was such that the baling wire could be safely stored in the quarry. Keith Cowden, an employee of the plaintiff for more than twenty years, testified that Mr. McMahan told him the temperature in the cave would remain at a constant 55 degrees and that there would be no humidity problem. Ray J. Barry, director of plaintiff's Farm Supplies Division, testified that Mr. McMahan told him that he was going to operate a licensed warehouse which would have a constant temperature of 55 degrees and would be exceptionally dry. Mr. Barry asked him if it would be suitable for storing baling wire and Mr. McMahan said that over a million pounds of soda ash was going to be stored there together with some grain. These employees of plaintiff had had extensive experience in the buying, selling and storage of baling wire. They knew that rust was a problem in storing baling wire. Mr. Barry, Mr. Cowden, and Mr. Ross thereafter went to the artificial cave and made an extensive tour and inspection of the warehousing facility. The only man they talked to at the quarry was Mr. McMahan, he was the only one they knew. No baling wire had ever been stored there. They found the facility to be a rough underground quarry with dirt and limestone floors, walls and ceilings; there was no heat and no mechanical controls of humidity. They looked for evidence of sweating on the walls and instead found a large amount of dust. Sometime thereafter the plaintiff entered into the agreement to store the baling wire.

■ The record shows that Mr. McMahan and his associates were starting a new business in which they had had no previous experience. The statements by Mr. McMahan to the effect that the quarry would be a suitable place for storing baling wire were not representations as to a past or present fact but at most were mere expressions of opinion. The law is well settled that a representation which amounts to nothing more than an expression of opinion is not actionable. Lowther v. Hays, Mo., 225 S.W.2d 708, 713 [7–9]; Budd v. Budd, 233 Mo.App. 377, 122 S.W.2d 402, 408 [4]; Collins v. Lindsay, Mo., 25 S.W.2d 84, 89–90 [5]. See also Loveless v. Locke Distributing Co., Mo., 313 S.W.2d 24, 32 [8].

■■ Where the parties are on an equal footing and the means of knowledge is equally available to both parties, a misrepresentation or erroneous statement of fact is not actionable. Paine v. Albany Insurance Co., Mo.App., 299 S.W.2d 897, 902 [4]; Bondurant v. Raven Coal Co., Mo. App., 25 S.W.2d 566, 574 [19]. Furthermore, where a party makes his own independent investigation, he will be presumed to have been guided by what he learned and the conclusions he reached and will not be permitted to say that he relied on misrepresentations of another and that he was deceived thereby. Bayer v. American Mutual Casualty Co., Mo., 359 S.W.2d 748, 754 [8]; Wood v. Robertson, Mo., 245 S. W.2d 80, 84 [4]; Patzman v. Howey, 340 Mo. 11, 100 S.W.2d 851, 856 [4].

Plaintiff relies chiefly on Brown v. Sloan's Moving & Storage Co., which twice came to this court by appeal, 274 S.W.2d 310, and 296 S.W.2d 20. In that case the plaintiff's household goods were destroyed by fire while stored in one of defendant's warehouses. A verdict was directed for the defendant at the first trial. On the first appeal, this court held that the statutes, and in particular §§ 406.090 and 406.210, imposed on the defendant the burden of proving that the fire was not due to its negli-

gence and further that the trial court erred in refusing plaintiff's evidence tending to show that the defendant had represented that the goods would be stored in a fireproof building equipped with a sprinkler system, that the representation was false and the plaintiff had relied on it. At the second trial the plaintiff submitted her case on two theories. One was that the defendant had failed and refused to deliver the goods on demand on which theory the defendant had the burden of proving that the fire was not due to its negligence. The other count submitted was on fraud and deceit due to plaintiff's reliance on false representations that her household goods would be stored in a fireproof warehouse. A judgment for the plaintiff for punitive as well as actual damages was affirmed on the second appeal. The appellate decisions in the Brown case do not support the proposition that the evidence in the instant case made an issue for the jury. On the contrary, insofar as Mr. McMahan's statements are relied on as terms or conditions of the storage agreement, the Brown opinions indicate that the representations must be of facts relied on by the bailor to his detriment.

The receipt or written agreement in this case was referred to during the trial but it was not introduced in evidence as an exhibit. However, another receipt issued to the plaintiff covering barbed wire, under the heading of "LIABILITY", Sec. 6, on the reverse side provides: "This company assumes no responsibility for concealed damages, * * * or other inherent qualities of merchandise, or from losses by reason of defective or insufficient containers, whether occurring while goods are in storage or are being handled, or for failure to detect or remedy the same." This receipt is one in a sheaf of papers marked and introduced by plaintiff as exhibit No. 5. The exemp-

tion of "other inherent qualities of merchandise" is consistent with rules of law referred to above. The section further provides that the company assumes no responsibility for losses arising from "any cause beyond control of this company in the exercise of the ordinary degree of care required of a warehouseman by law."

■ When the baling wire was deposited in the artificial cave, it was in sealed cartons and the defendants had no opportunity to inspect the wire itself, but it may be inferred from the evidence that it had not begun to rust at that time. The underground quarry provided low-cost storage. There was no means of controlling the amount of atmospheric moisture and the plaintiff knew this; it accepted the storage facility in its natural state. If the rusting of the wire was caused by moisture in the atmosphere of the cave, the mistake in judgment, lack of due care, or whatever it may be called, was fully participated in by the plaintiff's experienced representatives. They could not and did not rely on representations by the defendants. The contract of storage did not impose a duty or obligation on the defendants to prevent rust due to normal atmospheric conditions in the underground storage facility.

The defendants' motion for a directed verdict included grounds that the plaintiff had failed to prove sufficient facts to constitute a cause of action and that the plaintiff was guilty of negligence that directly contributed to the injury. The motion should have been sustained so any error in the giving or refusing of instructions is of no consequence.

Accordingly the judgment for the defendants is affirmed.

All of the Judges concur.