# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-1786
_____

SBFO Operator No. 3, LLC; HC Stores 2017, LLC; SBFO Operator No. 4, LLC; SBFO Operator No. 5, LLC; SBFO Operator No. 6, LLC; SBFO Operator No. 9 - Wichita, LLC; Anchor Mobile Food Markets, Inc.

*Plaintiffs - Appellants*

v.

Onex Corporation; Onex Partners IV, LP; Anthony Munk; Matthew Ross

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: January 11, 2024
Filed: May 8, 2024
_____

Before BENTON, ERICKSON, and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

This appeal involves a catastrophic series of investments in the Missouri-based discount grocery chain Save-A-Lot and its independent licensee program. The

Owner-Operators[1] of ten licensed grocery stores and their related company, Anchor Mobile Food Markets, Inc. (AMFM), sued Onex Partners IV, Onex Corporation, Anthony Munk, and Matthew Ross (collectively, Onex) for violations of Missouri common law and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)–(d). After limited discovery, the district court[2] granted summary judgment to Onex. We affirm.

I.

We trace the Owner-Operators' story back to 2014, when James Allen and his son founded Honor Capital, LLC, a company committed to providing military veterans with startup funding. They saw Save-A-Lot as a profitable way for veterans, backed by Honor Capital, to continue their public service by operating independently licensed grocery stores in food deserts.

To accomplish its mission, Honor Capital assembled an impressive crew. At the helm was Allen, an accomplished lawyer and self-described serial start-up guy. Joining him were Honor Capital's officers, sophisticated investors with nearly 100 years' combined experience in everything from real estate development and retail operations to investment banking and law. Together, they engaged affiliates, advisors, attorneys, and accountants. All this led to Honor Capital forming and controlling each of the Owner-Operators, whose sole purpose was to contract with Save-A-Lot and become independent licensees operating grocery stores.

For Honor Capital, and thus its Owner-Operators, Save-A-Lot sang a siren's song. On its website, Save-A-Lot solicited independent licensees by representing itself as a leading "hard discount" grocer with a "proven business model" and over

---

[1]The Owner-Operators are appellants SBFO Operator No. 3, LLC; HC Stores 2017, LLC; SBFO Operator No. 4, LLC; SBFO Operator No. 5, LLC; SBFO Operator No. 6, LLC; and SBFO Operator No. 9-Wichita, LLC.

[2]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

"40 consecutive years of growth." It told the Owner-Operators in September 2014 that its licensee store failure rate was only 3–4% annually since 2009. And it promised to sell inventory to its licensees "at bona fide wholesale prices." But Honor Capital and its Owner-Operators didn't just take Save-A-Lot at its word. In Allen's view, he and his team conducted "suitable diligence." That diligence led to the Owner-Operators opening their first three stores between 2015 and early 2016.

Enter Onex, which in December 2016 acquired Save-A-Lot from its corporate parent, SuperValu, by making an investment of $660 million. Through due diligence, Onex learned that Save-A-Lot suffered from mismanagement and needed an overhaul. But it was optimistic that it could improve the business—albeit by risking disruption to existing stores. Meanwhile, between price wars, slim profit margins, deflation, and food stamp reductions, the Owner-Operators saw significant losses. Yet they opened more and more stores. They also formed AMFM, an entity that they hoped would buy groceries from their stores and resell them from trucks.

Both Onex's and the Owner-Operators' investments met a disastrous end. By late 2018, all ten of the Owner-Operators' stores closed, and AMFM never took off. And by 2019, Onex lost the entire $660 million investment.

The Owner-Operators and AMFM sued—but they didn't set their sights on Save-A-Lot, the Owner-Operators' contractual counterparty. Instead, they sued Onex for fraudulent inducement, negligent misrepresentation, civil conspiracy, and aiding-and-abetting fraud under Missouri law. And they punched up their commercial dispute by alleging RICO violations. Onex moved to dismiss, arguing that before opening their stores, the Owner-Operators entered at least 54 broad contractual releases and anti-reliance disclaimers[3] barring their claims.

---

[3]The Owner-Operators signed 5 types of agreements: 16 Save-A-Lot Multiple Analytical Regression Tool Waivers, 10 License and Supply Agreements, 10 Incentive Agreements, 10 Fixed Operating Expense Reimbursement Agreements, and at least 8 Disclaimer Agreements.

-3-

The Owner-Operators and AMFM resisted, arguing that the releases and anti-reliance disclaimers were fraudulently induced. Because Onex's motion to dismiss related to matters outside the pleadings, the district court converted it to a motion for summary judgment, Fed. R. Civ. P. 12(d), and granted limited discovery, *id.* 56(d). On a fulsome record, the court granted summary judgment to Onex, reasoning that the 54 broad contractual releases and anti-reliance disclaimers barred the Owner-Operators' claims and that AMFM's free-standing claims failed. It also rejected their requests for more discovery and denied leave to amend the complaint.

## II.

We review the district court's grant of summary judgment *de novo* and view the facts in the light most favorable to the Owner-Operators and AMFM. *Beckley v. St. Luke's Episcopal-Presbyterian Hosps.*, 923 F.3d 1157, 1160 (8th Cir. 2019). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A.

We start with the releases and anti-reliance disclaimers. Under Missouri law, we presume that executed releases—like the ones discharging the Owner-Operators' claims here—are valid and enforceable. *Andes v. Albano*, 853 S.W.2d 936, 940 (Mo. banc 1993). So by introducing these agreements, Onex made a prima facie showing of entitlement to judgment. *Id.*

The Owner-Operators attack that prima facie showing by arguing that the releases were induced by fraud. *Cf. Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 767 (Mo. banc 2007) ("[A] party may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract." (citation omitted)). In doing so, they invoke the nine elements of fraudulent inducement:

a representation; that is false; that is material; the speaker's knowledge of its falsity or ignorance of its truth; the speaker's intent it be acted on; the hearer's ignorance of the falsity of the representation; the hearer's reliance; the hearer's right to rely on it; and injury.

*See State ex rel. PaineWebber, Inc. v. Voorhees*, 891 S.W.2d 126, 128 (Mo. banc 1995) (Benton, J.); *see also Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 131–32 (Mo. banc 2010). Failure to establish even a single element is fatal. *Renaissance Leasing*, 322 S.W.3d at 132.

The Owner-Operators say five of Save-A-Lot's representations induced them to enter the releases:

- Save-A-Lot's licensee store failure rate was about 3–4% annually from 2009–2014;
- Save-A-Lot had over 40 consecutive years of growth;
- Save-A-Lot is a hard discount grocer;
- Save-A-Lot has a proven business model; and
- Save-A-Lot promises to sell its inventory at bona fide wholesale prices.

They also claim that Onex owed them a duty to disclose its due diligence findings and that had it done so, they wouldn't have entered the releases. *Cf. PaineWebber*, 891 S.W.2d at 129 ("Silence or nondisclosure equals misrepresentation only when there is a duty to speak."). Neither the fraudulent misrepresentation theory nor the fraudulent nondisclosure theory saves the Owner-Operators' case.

1.

Save-A-Lot represented that its licensee store failure rate was about 3–4% annually from 2009–2014. The district court found that the Owner-Operators failed

to put forward enough evidence for a reasonable jury to find that this representation was false. We agree.

A single bullet point in a 22-slide PowerPoint presentation dated September 2014 asks, "What is the fail rate of [licensee] stores[?]" and answers, "[A]pproximately 3% to 4% annually since 2009." The Owner-Operators say the rate was closer to 20%. To prove that up, they take licensee store data from the 1990s, 2000s, and 2010s and calculate each decade's licensee store "closure rate." For the 2010s, their math yields a "closure rate" 5–7 times higher than the approximate 3–4% "failure rate" in the PowerPoint.

But even assuming that "failure rate" and "closure rate" mean the same thing, we think the Owner-Operators' *decennial* failure rates do nothing to invalidate the *annual* failure rates between 2009–2014. Those rates derive from the same data set and due diligence documents underlying the Owner-Operators' decennial rates. And when we look at the undisputed total numbers of licensee stores and licensee store closures for each year, we agree with both Onex and the district court that the evidence is consistent with Save-A-Lot's claimed failure rate of "approximately 3% to 4% annually since 2009." The Owner-Operators ask us to ignore this specific year-by-year data in favor of rates untethered to the represented period or any meaning that a similarly situated investor "would reasonably attach to [the failure-rate representation] in the existing circumstances." *Cf. Toenjes v. L. J. McNeary Constr. Co.*, 406 S.W.2d 101, 105 (Mo. Ct. App. 1966). At most, the Owner-Operators' decennial rates raise nothing more than "mere speculation, conjecture, or fantasy." *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003) (citation omitted). That is not enough to avoid summary judgment.

2.

For the four remaining representations, we find that the materiality and right-to-rely elements of fraudulent inducement are dispositive.

-6-

Take first the 40-consecutive-years-of-growth, hard-discount, and proven-business-model representations—all of which were on Save-A-Lot's website directed toward potential licensees. The Owner-Operators say these representations cannot "go unwhipped of justice." *Stonemets v. Head*, 154 S.W. 108, 114 (Mo. 1913). Yet we agree with the district court that especially given their public-facing and web-based locale, "no reasonably prudent buyer would place material significance" on such "vague promotional statements."

Usually, a representation's materiality is a fact question for the jury—that is, unless "all minds would agree it is or is not material." *Lafarge N. Am., Inc. v. Discovery Grp. L.L.C.*, 574 F.3d 973, 982 (8th Cir. 2009) (quoting *Cont'l Cas. Co. v. Maxwell*, 799 S.W.2d 882, 889 (Mo. Ct. App. 1990)). Relevant here is how Missouri common law has long distinguished statements of fact from those of bluster and boast. Generally, vague opinions, commendatory trade talk, sales propaganda, and fortune-telling are immaterial as a matter of law. *Wingfield v. Wabash R.R. Co.*, 166 S.W. 1037, 1042 (Mo. banc 1914); *Arnold v. Erkmann*, 934 S.W.2d 621, 627 (Mo. Ct. App. 1996). We've found such "puffery" immaterial across the board. *E.g.*, *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 390–91 (8th Cir. 2004) (Lanham Act); *City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 556–57 (8th Cir. 2021) (securities fraud).

Despite the incredible value the Owner-Operators say they placed on these website statements, each is fuzzy sales propaganda. *See Meredith*, 16 F.4th at 557 (describing "proven strategies" and "industry-leading position," among other representations, as "paradigmatic examples of the kind of 'vague' and 'optimistic' rhetoric that constitutes corporate puffery"); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1123–24 (8th Cir. 1999) (representation that product had "consistently lower pressure drops" was "mere puffery" (cleaned up)). When Save-A-Lot described itself as a "hard discount" grocer with a "proven business model" and over "40 consecutive years of growth," it "look[ed] with favor upon [its] own property," no doubt "motivated by a desire for gain." *Arnold*, 934 S.W.2d at 627. Such statements that flex general superiority are divorced from any concrete metric and

are not actionable. Consider "growth," for example. The Owner-Operators admit the word might mean "growth in stores," "growth in same-store sales," or even "growth in overall sales for licensees." Their efforts to objectively define the website statements only inject more ambiguity and defeat any hope of verifying them. *See Am. Italian Pasta*, 371 F.3d at 391 (distinguishing puffery from statements "capable of verification").

What's more, the Owner-Operators did not have a right to rely on any of the website or bona-fide-wholesale-prices representations as a matter of law. That is because "a party who undertakes an independent investigation does not have the right to rely on the misrepresentations of another." *Renaissance Leasing*, 322 S.W.3d at 132.

It is hard to overstate the scope of the Owner-Operators' years-long independent investigation into Save-A-Lot. At nearly every phase of their investment, the Owner-Operators had access to the contours of Save-A-Lot's hard discount business model, historical growth, and method for charging bona fide wholesale prices. *Cf. Consumers Coop. Ass'n v. McMahan*, 393 S.W.2d 552, 556 (Mo. 1965) (noting that "where a party makes his own independent investigation, he will be presumed to have been guided by what he learned and the conclusions he reached"). Through Honor Capital, they enlisted affiliates, advisors, attorneys, and accountants to suss out Save-A-Lot's virtues. Allen and company prepared their own pro forma projections and attended multiple day-long sessions, symposiums, and trainings about licensee operations. And they convened their attorneys, an accountant, and a banker for a closed-door Q&A meeting with Save-A-Lot's licensee team, where they reviewed data on Save-A-Lot's historical growth.

And "[a]lthough there are three exceptions to the investigation rule, none of the exceptions applies." *Renaissance Leasing*, 322 S.W.3d at 132. The three exceptions are:

(1) the investigating party makes only a partial investigation and relies on both the results of the inspection and the misrepresentation; (2) the buyer lacks equal footing for learning the truth, and the facts are not easily ascertainable but are peculiarly within the knowledge of the seller; and (3) the seller makes a specific and distinct misrepresentation.

*Id.* at 132–33. The Owner-Operators make a run at each one.

We've already concluded that Save-A-Lot's website representations are puffery, so none can be "distinct and specific representations of *fact*." *Cf., e.g., Premium Fin. Specialists, Inc. v. Hullin*, 90 S.W.3d 110, 115 (Mo. Ct. App. 2002) (emphasis added). And beyond the full-scale, boots-on-the-ground investigation evinced by the record, the Owner-Operators repeatedly agreed—over roughly three years—to do their "own independent factual investigation" before investing in any store location or the licensee program and later agreed that they had in fact done so for each one of their ten stores. Boasting over 100 years' combined experience in relevant industries, they fixed in writing that they did "not rel[y] upon [Save-A-Lot's] representations" and had the "requisite expertise" to make their investment, which they confessed was "a complex, high-risk business decision" with "no guarantee of financial success." All this, and with the help of reputable business, legal, and financial advisors. If the decision to enter the releases was induced by Save-A-Lot's supposedly false website statements or promise to charge bona fide wholesale prices for inventory, "the mistake in judgment," lack of attention, "or whatever it may be called, was fully participated in by the [Owner-Operators'] experienced representatives." *Cf. McMahan*, 393 S.W.2d at 557.

Because the investigation rule applies, the Owner-Operators did not have a right to rely on any of these remaining representations as a matter of law.

3.

The Owner-Operators also claim that Onex owed them a duty to disclose its due diligence findings and that its failure to do so fraudulently induced them to enter the releases. *See Hess*, 220 S.W.3d at 765 ("A duty to speak arises where one party has superior knowledge or information that is not reasonably available to the other."). Specifically, they say Onex should have disclosed that Save-A-Lot's former corporate parent SuperValu poorly managed the business and that Onex's plan to turn things around risked disrupting existing grocery stores.

Even if we accept that Onex had superior knowledge about Save-A-Lot through its pre-acquisition due diligence, Missouri law imposes a duty to disclose "only if" the Owner-Operators could not have discovered the supposedly material facts "through the exercise of ordinary diligence." *Id.* at 766. Tacked to the Owner-Operators' extraordinary diligence was their extensive real-time experience. Soon after opening their third store, they saw deflated financial results that differed noticeably from the sales projections they obtained from Save-A-Lot. And on the heels of opening two more stores and Onex's acquisition, they learned that SuperValu was a "horrible company" that "sucked the life out of" the business. *Cf. Wood v. Robertson*, 245 S.W.2d 80, 84–86 (Mo. 1952) (noting that the "slightest" inquiry "would no doubt have fully disclosed the facts which plaintiff [said] were misrepresented," especially where nothing "anesthetize[d] h[er] sense of caution").

All along, the Owner-Operators knew that the grocery industry was intensely competitive and had notoriously slim profit margins, but they took a risk—opening more stores and entering more releases. They are now "in the untenable position of asserting [they] could not attain information the potential existence of which [they] should have inferred from matters within [their] knowledge at the time [they] signed the release[s]." *McMahon v. Meredith Corp.*, 595 F.2d 433, 440 (8th Cir. 1979) (applying Missouri law).

\*

Missouri courts have long protected parties "against the machinations of the designedly wicked." *Conklin v. Mo. Pac. R.R.*, 55 S.W.2d 306, 308 (Mo. banc 1932) (citation omitted). So where a party makes a submissible case that she was fraudulently induced to enter a release, she will not be held to its terms at summary judgment. *E.g.*, *Lafarge*, 574 F.3d at 982. But that's not the case here. We conclude that the Owner-Operators have failed to raise a genuine dispute of material fact that they were fraudulently induced to enter the releases.[4]

### B.

Having found that the releases are valid, we agree with the district court that they end the Owner-Operators' case. In doing so, we "give[] full effect" to their "plain and unambiguous language." *Andes*, 853 S.W.2d at 941. Especially relevant here is the broad release found in ten agreements that the Owner-Operators entered before opening each one of their ten stores:

> [Owner-Operator] does hereby release and discharge [Save-A-Lot], its parent, subsidiaries and affiliated corporations and each of their officers . . . from any and all claims, . . . which [Owner-Operator] has, may have or might have[,] . . . which may result from or relate in any manner to the Store.

We have no trouble finding that the plain language of these releases extinguishes the Owner-Operators' causes of action under Missouri common law, each of which "result from or relate in [some] manner" to their stores. *See id.* at 939–41 (release barred civil conspiracy claim); *PMX Indus., Inc. v. LEP Profit Int'l*,

---

[4]We likewise reject any attempt to avoid the releases based on Save-A-Lot's innocent or negligent misrepresentation, theories that fail for the same reasons the fraudulent misrepresentation theory fails. *See Renaissance Leasing*, 322 S.W.3d at 136; *cf. Lafarge*, 574 F.3d at 986.

31 F.3d 701, 703–04 (8th Cir. 1994) (same for fraudulent and negligent misrepresentation under Iowa law).

As for their RICO claims, the Owner-Operators say the alleged RICO schemes involved Save-A-Lot fraudulently promising to charge bona fide wholesale prices and fraudulently representing certain aspects of its business to induce their investment. Like the conduct giving rise to the common law claims, the alleged RICO conduct occurred before the Owner-Operators executed the releases, so the claims are barred. *See MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.*, 161 F.3d 443, 448–49 (7th Cir. 1998) (rejecting argument that "each act in furtherance of a conspiracy gives rise to a separate cause of action" post-dating the release since scheme was "clearly based on pre-[release] conduct"); *see also Williams v. Stone*, 109 F.3d 890, 892, 896 (3d Cir. 1997); *Pasternack v. Shrader*, 863 F.3d 162, 171, 173–74 (2d Cir. 2017).[5]

## III.

Next, the discovery dispute. The Owner-Operators argue that the district court pulled the trigger on summary judgment too soon. *See Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 530 (8th Cir. 1999). "We review for abuse of discretion a trial court's determination that a claim is ripe for summary judgment." *Robinson v. Terex Corp.*, 439 F.3d 465, 466–67 (8th Cir. 2006). For reversal, the Owner-Operators must show that "discovery has been inadequate." *Id.* at 467.

The Owner-Operators' entire case hinges on whether they were fraudulently induced to enter the releases barring their claims. So the district court granted "limited discovery" calculated to flesh out facts fit for that question: it ordered the Owner-Operators to produce documents relevant to their decisions to enter the releases and ordered Onex to produce documents mentioning the Owner-Operators,

---

[5]We do not address the enforceability of a release that is an integral part of an alleged RICO scheme or that immunizes future RICO conduct.

their principals, and their stores. The Owner-Operators insist they deserve more. But their requests—like for information about "[w]hether a licensee has ever successfully sued" Save-A-Lot and, "if so, the remedy or remedies awarded," or about the "parties' financial condition"—are beyond the scope of the dispositive issue in this case. *See Pony Comput., Inc. v. Equus Comput. Sys. of Mo., Inc.*, 162 F.3d 991, 996–97 (8th Cir. 1998).

We agree with the district court that further discovery, even from non-party Save-A-Lot, "would be largely duplicative and, in any case, futile." Suffice it to say that given the circumstances, the Owner-Operators cannot, "by their sole insistence," declare swaths of evidence discoverable and relevant. *Cf. Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 925–26 (8th Cir. 2014). We see no abuse of discretion.

IV.

Two loose ends. First, we agree with the district court that AMFM's claims against Onex fail. Neither Save-A-Lot nor Onex contracted with AMFM. Save-A-Lot never solicited AMFM's business or made any actionable representations to it. Nor is there any allegation that Onex itself even knew AMFM existed such that it could have foreseen AMFM's supposed injury. *Cf. Patzman v. Howey*, 100 S.W.2d 851, 856 (Mo. 1936) (holding that the "judgment [could not] stand" where fraud "case was tried and submitted as though it was a suit against the [non-party who made the misrepresentation] rather than a suit against defendant individually").

Second, the Owner-Operators and AMFM say the district court erred by denying them leave to amend their complaint. Reviewing for abuse of discretion, we note that generally, "a party must submit the proposed amendment [to its complaint] along with its motion." *Clayton v. White Hall Sch. Dist.*, 778 F.2d 457, 460 (8th Cir. 1985). Not only did the Owner-Operators and AMFM fail to submit a proposed amended complaint, but they also merely requested leave in a footnote in their summary judgment response without explaining "how [they] would amend the complaint to save the[ir] claim[s]." *Brandt v. David*, 191 F.3d 887, 893 (8th Cir.

-13-

1999) (no abuse of discretion in denying leave to amend); *see also In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 884–85 (8th Cir. 2009) (same where party "merely included a footnote at the end of his response to [a] motion to dismiss"). Accordingly, we affirm the district court's denial of leave to amend.

V.

In our history of applying Missouri law, we have never gone to that "romantic length" of shielding sophisticated parties "against the consequences of their own indolence, listless inattention, or unwarranted credulity in the transaction of business affairs." *Homolla v. Gluck*, 248 F.2d 731, 735 (8th Cir. 1957) (quoting *Poe v. Ill. Cent. R.R.*, 99 S.W.2d 82, 89 (Mo. 1936)). We do not break from that tradition here.

The district court's judgment is affirmed.

_____