# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 22-3457

———————————————

RightCHOICE Managed Care, Inc.; Blue Cross of California, Inc., doing business as Anthem Blue Cross; Anthem Blue Cross Life and Health Insurance Company; Rocky Mountain Hospital and Medical Service, Inc., doing business as Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc., doing business as Anthem Blue Cross and Blue Shield; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc., doing business as Anthem Blue Cross and Blue Shield; Anthem Health Plans of Kentucky, Inc., doing business as Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc., doing business as Anthem Blue Cross and Blue Shield; Healthy Alliance Life Insurance Company; HMO Missouri, Inc.; Anthem Health Plans of New Hampshire, Inc., doing business as Anthem Blue Cross and Blue Shield; Empire HealthChoice Assurance, Inc., doing business as Empire Blue Cross and Blue Shield; Community Insurance Company, doing business as Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc., Anthem Blue Cross and Blue Shield; HMO Healthkeepers, Inc., doing business as Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield of Wisconsin, doing business as Anthem Blue Cross and Blue Shield; Compcare Health Services Corporation; Blue Cross Blue Shield of Michigan Mutual Insurance Company; Blue CrossM, Inc., doing business as Blue Cross Blue Shield of Minnesota; Regence Bluecross Blueshield of Oregon; Regence Bluecross Blueshield of Utah; Regence Blueshield; Regence BlueShield of Idaho, Inc.

*Plaintiffs - Appellees*

v.

Hospital Partners, Inc.; Hospital Laboratory Partners, LLC; RAJ Enterprises of Central Florida, LLC, Pinnacle Laboratory Services; Empower H.I.S. LLC; David Byrns; Jorge Perez

*Defendant*s

LabMed Services, LLC; SeroDynamics, LLC; Beau Gertz; Mark Blake

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: April 9, 2024
Filed: July 29, 2024

_____

Before LOKEN, SHEPHERD, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Beau Gertz, Mark Blake, SeroDynamics, and LabMed Services (collectively, the Sero Defendants) perpetrated a pass-through billing scheme for lab tests billed from a 15-bed hospital in Unionville, Missouri. A jury found them liable for fraud, tortious interference with contract, civil conspiracy, and money had and received under Missouri law. On appeal, they raise numerous claims of error. We affirm the district court's[1] judgments.

I.

We recount the facts in the light most favorable to the verdicts. *Kimbrough v. Loma Linda Dev., Inc.*, 183 F.3d 782, 783 (8th Cir. 1999). Here's the long and short of them: the Sero Defendants made the blood tests they ran from their Colorado lab look like they were run from a rural Missouri hospital. This "pass-

_____

[1]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri.

through billing"[2] scheme was lucrative, bringing the Sero Defendants an approximately $26.3 million windfall.

We trace the story to when Blue Cross[3] contracted with Putnam County Memorial Hospital, a 15-bed hospital in Unionville, Missouri. The Putnam-Blue Cross Contract stated that Putnam "shall bill only for Hospital Services performed by, or under the direction and personal supervision of [Putnam]." It also made Putnam in-network with Blue Cross and its members.

Being in-network with Blue Cross made for good money-making. That's why the Sero Defendants—specifically, Gertz and Blake—hoped their Colorado lab, SeroDynamics, would also become in-network. But Blue Cross rejected its application. The lab was losing money, so the Sero Defendants set their sights on Blue Cross's in-network hospitals.

At first, that was Campbellton-Graceville Hospital (CGH) in Jackson County, Florida. The Sero Defendants connected with Jorge Perez, who managed CGH. In Gertz's words, they "hit gold" when they signed an agreement with the hospital after finding out that it was in-network with Blue Cross. SeroDynamics then performed tests for patients with no connection to CGH. When it came time for payment, the Sero Defendants worked with Perez's company Empower to bill the tests to Blue Cross using CGH's provider numbers—its Tax Identification Number (TIN) and National Provider Identifier (NPI). The use of these identifiers made it look like CGH performed the tests when in fact it didn't. But the scheme stopped when Blue Cross stopped payments to CGH, which told the Sero Defendants that their arrangement might be fraud.

---

[2]A witness at trial explained that "pass-through billing" in the healthcare industry refers to a claim that "is submitted under the identifier of one provider for work that is done by a different provider."

[3]We use "Blue Cross" to refer both collectively and individually to the 25 plaintiff-appellees listed in the caption, all of which are licensees or subsidiaries of independent licensees of Blue Cross Blue Shield Association.

Meanwhile, Putnam was in dire financial straits. Perez and David Byrns, through their company Hospital Partners, saw an opportunity. Byrns came on as Putnam's CEO, and after discovering that it was in-network with Blue Cross, he had the hospital engage with Empower, which agreed to handle its billing.

That brings us to the Sero Defendants. Leveraging their relationship with Perez, they entered the Sero-Putnam Contract, which required Putnam, and thus Empower, to bill SeroDynamics's tests to "third-party payers" like Blue Cross under Putnam's provider numbers. So began a scheme like the one at CGH, where the Sero Defendants billed tests for patients with no connection to Putnam whatsoever. They even got Putnam to bill for unpaid tests from the Sero Defendants' other ventures—including the tests that CGH stopped paying after Blue Cross intervened. Like at CGH, the use of Putnam's provider numbers made it appear like Putnam performed the tests. And in the end, Blue Cross paid Putnam $18,053,015 for SeroDynamics's tests.

Blue Cross sued the Sero Defendants, Hospital Partners, Empower, Byrns, Perez, and others. Only the Sero Defendants went to trial, and after five days of evidence, the jury found them liable for fraud, tortious interference with contract, civil conspiracy, and money had and received. It then awarded Blue Cross $18,053,015 in compensatory damages as well as $1.9 million in punitive damages against each of the four Sero Defendants.

II.

The Sero Defendants urge us to reverse the district court's judgments for eight independent reasons. We take each argument in turn.

## A.

We first address the Sero Defendants' challenge to the district court's decision to bar their lead counsel from delivering closing argument—a sanction that we review for abuse of discretion. *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005).

Federal courts are "vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 227 (1821). When a district court uses its inherent power "to achieve the orderly and expeditious disposition of cases" by "disciplin[ing] attorneys who appear before it," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation omitted), it must do so with "great caution," *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 531 (1824).

We think the district court did so here. Lead counsel's conduct throughout the court's three years' experience with this case laid the groundwork for the sanction. *See Gallagher v. Magner*, 619 F.3d 823, 844 (8th Cir. 2010) (explaining that district courts are due "substantial deference" when crafting sanctions given their "familiarity with the case and counsel" (citation omitted)). What started with deposition misconduct and "obstructionist discovery tactics" moved to scheduling order violations. Things didn't get better during trial. The district court observed that counsel engaged in "trial by ambush," elicited testimony at odds with the court's orders on motions *in limine*, disregarded a sustained objection, and mired the case in "misdirection, obfuscation, and confusion." All the while, it gave warnings that it might sanction him by excluding him from a portion of the proceedings. On the third day of trial, for example, it cautioned that he was "getting close" to having to "stand down" and "sit in the second chair . . . for the rest of the trial." When it barred counsel from delivering closing arguments, the court sought to serve the "bedrock principles" of "civility, professionalism, integrity, efficiency, expediency, and deterrence," *Wescott Agri–Prods., Inc. v. Sterling State Bank, Inc.*, 682 F.3d 1091, 1095–96 (8th Cir. 2012), which all support the sanction here.

The Sero Defendants' arguments to the contrary don't persuade. For starters, they repeatedly rely on *Macheca Transport Co. v. Philadelphia Indemnity Insurance Co.*, where we observed that "the extreme measure of *disqualifying* a party's counsel of choice should be imposed only when absolutely necessary." 463 F.3d 827, 833 (8th Cir. 2006) (emphasis added) (citation omitted). But the district court here did not *disqualify* counsel—he could draft the closing argument, assist with its preparation, and sit at counsel's table during it—so *Macheca* is inapposite. Nor are we moved by suggestions that the court should have tried to preside over counsel's closing arguments and reserved any intervention until misconduct materialized. *Cf. Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 268 (8th Cir. 1993) ("[W]hether the extent of a sanction is appropriate is a question peculiarly committed to the district court."). The court weighed whether "stopping [him] after one minute of the closing argument" would be more prejudicial to the Sero Defendants than precluding him from arguing altogether. It then landed on what it thought was "the least harsh decision [it] could come up with," meaning the Sero Defendants' other lawyer— who had practiced law for 12 years, represented them for a year, and examined a witness at trial—gave the closing argument. We see no abuse of discretion in the court's considered decision.

## B.

Second, the Sero Defendants say that the district court erred by admitting irrelevant or unfairly prejudicial evidence—three sentences from an Audit Report of Putnam—for limited purposes and with a limiting instruction. *See* Fed. R. Evid. 401, 403. We review for abuse of discretion and reverse only if an error affected their substantial rights. *Green v. City of St. Louis*, 507 F.3d 662, 669 (8th Cir. 2007).

The Missouri State Auditor's Office issued an Audit Report detailing the Putnam Board of Trustees' lack of oversight of out-of-state lab contracts, like the Sero-Putnam Contract, while Byrns was CEO. Blue Cross wanted to use the Audit Report when examining his replacement, Gayle Pickens. The district court initially

excluded the report from evidence while allowing general discussion of its existence. But it warned the Sero Defendants that the "way [the Audit Report] comes in" was if they opened the door on cross-examination, so it advised them to "tread lightly."

They didn't. The Sero Defendants opened the door by repeatedly asking Pickens on cross-examination whether and to what extent Byrns informed the Board about out-of-state lab activity. They did so to show that Putnam knew exactly what labs like SeroDynamics were up to. The consequence was that the court admitted three sentences of the Audit Report:

> The Board [of Trustees] has not provided appropriate oversight of laboratory contracts entered into by the new CEO/management company President. As a result, the hospital is incurring unnecessary payroll costs, and is involved in questionable laboratory billing practices.
>
> Immediately upon signing the current management contract with the hospital, the CEO and his associates began billing significant amounts of out-of-state lab activity through the hospital.

The court gave a limiting instruction, advising the jury that it could not consider the Audit Report for the truth of the matter asserted—that Putnam was "involved in questionable laboratory billing practices." The jury could, however, consider it for purposes such as explaining its impact on a witness or judging a witness's credibility. With the three sentences admitted, Blue Cross asked Pickens on redirect about her understanding of what the Board knew about Byrns's activities involving out-of-state labs.

Under these circumstances, the district court did not abuse its discretion by admitting that small portion of the Audit Report. The Audit Report was relevant because it helped explain why Pickens began investigating out-of-state lab activity after becoming CEO, and it reinforced Pickens's testimony that the Board did not

-7-

understand what Byrns or the Sero Defendants were up to. *See* Fed. R. Evid. 401(a) (stating that evidence is relevant when "it has any tendency to make a fact more or less probable"). And its probative value was not "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "We have allowed the use of otherwise inadmissible evidence to clarify or rebut an issue opened up by defense counsel on cross-examination." *United States v. Beason*, 220 F.3d 964, 968 (8th Cir. 2000). So "[b]y violating the district court's clearly articulated . . . warning," the Sero Defendants shot themselves in the foot: their cross-examination of Pickens increased the probative value of that portion of the Audit Report. *Chism v. CNH Am. LLC*, 638 F.3d 637, 641 (8th Cir. 2011). While the evidence was "undoubtedly prejudicial," *id.*, it was not unfairly so.

## C.

Up third and fourth are the Sero Defendants' arguments that the district court erred by denying their renewed motion for judgment as a matter of law on Blue Cross's fraud and tortious interference claims. We review *de novo*, using the same standards as the district court. *K.C. Hopps, Ltd. v. Cincinnati Ins. Co.*, 78 F.4th 1002, 1004 (8th Cir. 2023).

### 1.

Start with the fraud. That claim has nine elements, but the Sero Defendants challenge the evidence for just one: that they made "a representation." *See SBFO Operator No. 3, LLC v. Onex Corp.*, 101 F.4th 551, 557 (8th Cir. 2024) (citation omitted) (applying Missouri law, listing the elements of fraud, and noting that "[f]ailure to establish even a single element is fatal"). They say that the patient and testing data they sent to Empower was accurate and that *Empower* was the one that

made the misrepresentation: adding Putnam's provider numbers when it billed Blue Cross.[4]

We disagree. Granted, this is not the traditional fraud case. Rather, both parties recognize that Blue Cross proceeded under a theory of *indirect* fraud. In *Freeman v. Myers*, the Missouri court of appeals adopted the rule in the Restatement (Second) of Torts § 533:

> The maker of a fraudulent misrepresentation is subject to liability . . . if the misrepresentation, although *not made directly to the other*, is made *to a third person* and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction.

774 S.W.2d 892, 894 (Mo. Ct. App. 1989) (emphasis added); *see also Grabinski v. Blue Springs Ford Sales, Inc.*, 136 F.3d 565, 569 (8th Cir. 1998). Simply put, the Sero Defendants are liable for fraud if the jury could reasonably conclude that the misrepresentation—submitting bills to Blue Cross under Putnam's provider numbers—*originated* from the Sero Defendants. *See Wagner v. Mortg. Info. Servs., Inc.*, 261 S.W.3d 625, 640 (Mo. Ct. App. 2008).

And we think the jury could do so here. Most relevant is the Sero-Putnam Contract provision where the Sero Defendants required that SeroDynamics's tests be billed to "third party payers under [Putnam's] provider numbers." Of course, to be paid, SeroDynamics had to send its patient and test information to its codefendant Empower, which handled Putnam's billing. Empower then added Putnam's provider numbers while billing Blue Cross for the tests in accordance with the Sero-Putnam

---

[4]To the extent the Sero Defendants argue that the evidence does not support the jury's determination that the use of Putnam's provider numbers was a misrepresentation, we disagree. To quote the district court, there was "a mountain of evidence support[ing] the jury's verdicts."

Contract. At trial, the Sero Defendants testified that they knew Empower had to use Putnam's provider numbers when billing Blue Cross, which then "generate[d] millions of dollars in profits" for SeroDynamics. So the jury could reasonably conclude that the Sero Defendants were the source of the misrepresentation to Blue Cross: the "representation implicit" in their delivery of patient and test information to Empower indirectly constituted the provider-number misrepresentation, which Empower repeated directly to Blue Cross. *Freeman*, 774 S.W.2d at 893. The Sero Defendants not only knew this misrepresentation would materialize, they also ensured as much by requiring it in the Sero-Putnam Contract.

2.

Now to the tortious interference. That claim has five elements: (1) a contract, (2) the Sero Defendants' knowledge of the contract, (3) their intentional interference that induces or causes a breach of the contract, (4) the absence of justification, and (5) damages. *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990). The Sero Defendants only challenge the evidence for the second and fourth elements.

We begin by looking for evidence that the Sero Defendants either (1) "had actual knowledge of the existence of the [Putnam-Blue Cross] [C]ontract and of [Blue Cross's] interest in it" or (2) "had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the [Putnam-Blue Cross] [C]ontract and [Blue Cross's] interest in it." *Howard v. Youngman*, 81 S.W.3d 101, 113 (Mo. Ct. App. 2002) (citation omitted). And we don't need to look far. At trial, the Sero Defendants said that despite requesting the Putnam-Blue Cross Contract, they never saw it. Yet they admitted that they knew about a contract that made Putnam in-network with Blue Cross when they contracted with Putnam. Plus, Blue Cross rejected SeroDynamics's application to become in-network, prompting the Sero Defendants to contract first with CGH and then Putnam to get the benefits of Blue Cross's in-network reimbursement rates. The Sero Defendants testified that they sought to "drive business" by contracting with Putnam because they

-10-

"understood that all the billing would flow through the hospital" under the Putnam-Blue Cross Contract, which all the while required that Putnam "bill only for Hospital Services performed by, or under the direction and personal supervision of [Putnam]." The jury could reasonably infer from this evidence that the Sero Defendants had actual knowledge of the Putnam-Blue Cross Contract.

The Sero Defendants' absence-of-justification argument fares no better. "'Absence of justification' means the absence of any legal right on a defendant's part to take the actions about which plaintiff complains." *Id.* at 115 (citation omitted). The Sero Defendants say that they were justified in interfering with the Putnam-Blue Cross Contract because SeroDynamics served as a "reference lab" for Putnam, which enabled them to bill under Putnam's provider numbers. Not so. The evidence established that a hospital outsources tests for *its* patients to a "reference lab" when it lacks the lab equipment to do the test itself. In that case, Putnam could bill for the reference lab's testing under the Putnam-Blue Cross Contract because it "collect[ed] the sample[] in-house," had "the medical records for that patient," and referred its patient to the lab. The critical distinction between a "reference lab" and a lab like SeroDynamics was that *none* of the patients SeroDynamics billed under Putnam's provider numbers were Putnam patients. Given all this, a reasonable jury could conclude that there was no justification for the Sero Defendants' intentional interference with the Putnam-Blue Cross Contract.

\*

We hold that the district court properly denied the Sero Defendants' renewed motion for judgment as a matter of law. With that, the Sero Defendants' fifth challenge regarding Blue Cross's claim for civil conspiracy fails because their only argument for reversal is that we should reverse the judgments for fraud and tortious interference. *Cf. Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. banc 1999) (where underlying tort claims fail, civil conspiracy claim fails). And since Blue Cross's judgments for fraud, tortious interference, and civil conspiracy remain intact, the Sero Defendants' sixth challenge regarding the jury's punitive damages

-11-

awards likewise fails. *Cf. Kelly v. State Farm Mut. Auto Ins. Co.*, 218 S.W.3d 517, 526 (Mo. Ct. App. 2007) (reversing punitive damages award where plaintiffs "failed to prove an underlying [claim] that could support a punitive damages award").

## D.

Moving to their seventh challenge, the Sero Defendants argue that the district court erred by instructing the jury on their knowing retention of proceeds of fraud in Instruction Nos. 31–34. Because they failed to object, they "must show that an obvious error in the jury instructions affected [their] substantial rights and that the error seriously affected the integrity, fairness, or public reputation of judicial proceedings." *Olsen as Tr. for Xurex, Inc. v. Di Mase*, 24 F.4th 1197, 1204 (8th Cir. 2022) (citation omitted).

The Sero Defendants fail to show any error. Their only argument is that the offending instructions "do[] not require the jury to find any of the [nine] essential elements of fraud." *See, e.g.*, *SBFO Operator No. 3*, 101 F.4th at 557 (listing the elements). True enough. But as Blue Cross points out, other instructions tracked the nine essential elements of fraud, and we've already concluded that a reasonable jury could find in favor of Blue Cross on that claim. Instruction Nos. 31–34 merely submitted to the jury an *alternative* theory of liability—one we endorsed in *Pelster v. Ray*, 987 F.2d 514, 523 (8th Cir. 1993) (quoting *Walters v. Maloney*, 758 S.W.2d 489, 500 (Mo. Ct. App. 1988)).

We cannot view the instructions "in a vacuum." *Olsen*, 24 F.4th at 1204 (citation omitted). Rather, we must view them "along with the evidence adduced at trial" and, most importantly, "in the context of the rest of the jury instructions." *Id.* (citation omitted). Under these circumstances, there was no error in the district court's instruction.

E.

Winding up with their eighth and final issue, the Sero Defendants argue that the district court erred in entering judgment for Blue Cross on its claims for money had and received. They say the $18,053,151 in damages were both excessive and not supported by the evidence. Reviewing for plain error, we again disagree. *Simco v. Ellis*, 303 F.3d 929, 933 (8th Cir. 2002) (noting that we "reverse only if the amount of damages is so disproportionate that it would be a miscarriage of justice to affirm it").

A money-had-and-received claim has three elements: (1) the Sero Defendants "received or obtained possession of [Blue Cross's] money," (2) they "thereby appreciated a benefit," and (3) their "acceptance and retention of the money was unjust." *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 898 (8th Cir. 2014) (quoting *Ward v. Luck*, 242 S.W.3d 473, 476 (Mo. Ct. App. 2008)). The evidence at trial demonstrated that the Sero Defendants received $26.3 million from Putnam, while Putnam received $18,053,015 from Blue Cross for the tests SeroDynamics performed. Though Putnam acknowledged that it may have used some of the $18,053,015 for expenses other than payments to the Sero Defendants, it was not unjust for the jury to award Blue Cross the amount it paid for SeroDynamics's tests fraudulently billed under Putnam's provider numbers. That's especially so where the evidence demonstrated that the Sero Defendants reaped more for their fraud. *See Bueneman v. Zykan*, 181 S.W.3d 105, 113 (Mo. Ct. App. 2005) (explaining that money had and received "is not limited to" whether a defendant "took or received any money from" the plaintiff and that the claim "reach[es] monies which in equity and good conscience ought not to be retained by the defendant"); *see also* 35 Robert H. Dierker & Richard J. Mehan, *Missouri Practice Series, Contracts, Equity, and Statutory Actions Handbook* § 42:12 (2024) ("Because money had and received is a restitutionary action, the plaintiff's damages consist of the fund wrongfully withheld by the defendant."). All told, we cannot say that this is "the exceptional case where [an] error"—if any—amounts to a miscarriage of

-13-

justice. *Vines v. Welspun Pipes, Inc.*, 9 F.4th 849, 858 (8th Cir. 2021) (citation omitted).

## III.

We affirm the district court's judgments. The Sero Defendants' motion to supplement the record is denied as moot.

_____